## George Westinghausen v. The People.

*Liquor tax law—contingent fund—" general election."*

The Constitution (Art. xiv. § 14) requires every tax-law to distinctly state the tax and the object to which it should be applied, and declares that it shall not be sufficient to refer to any other law to fix such tax or object.  *Held* that Act 268 of 1879 to "provide for the taxation of the business of manufacturing and selling spirituous and intoxicating, malt, brewed, or fermented liquors" and to repeal Act 228 of 1875 as amended by Act 197 of 1877, in directing the tax to be placed to the credit of the contingent fund of the township, city or village

from which it is collected, and paid over to the proper local officer to be used for the purposes of that fund, is sufficiently specific.

The requirement that constitutional amendments must be submitted at the "next general election" after they were proposed, meant the biennial November election for State officers, until 1876 when the requirement was changed to permit submission at both Spring and Fall elections.

The Legislature can make its own definitions for statutory purposes, but cannot thereby change a constitutional definition.

Error to Saginaw. Submitted June 22. Decided October 6.

COMPLAINT under Act 268 of 1879 for selling liquor without paying the liquor tax. Respondent was convicted. Affirmed.

*Tarsney, Tennant & Weadock* for plaintiff in error.

Attorney-General *Otto Kirchner* for the people.

CAMPBELL, J. Plaintiff was convicted under the Liquor Law of 1879 of selling liquor without having paid the required tax.

The case comes up on two specified objections to the constitutionality of the law — *First*, that the amendment whereby the anti-license clause in the original constitution was repealed, was not lawfully submitted to the people; and *second*, that the law does not indicate the object to which the tax is to be applied.

This last point refers to article 14, § 14, of the Constitution, which declares that "Every law which imposes, continues, or revives a tax, shall distinctly state the tax, and the object to which it is to be applied; and it shall not be sufficient to refer to any other law to fix such tax or object."

This section, which does not seem to have been discussed at all in the Constitutional Convention, was evidently borrowed from an amendment to the Constitution of 1835, proposed in 1842, and ratified in 1843, which provided in substance that every law creating a State debt should specify the object for which the money was to be appropriated, and be

confined to a single object, and all money raised under it should be applied to the specific object stated in the law, and to no other purpose. Sess. Laws 1842, p. 157; Sess. Laws 1843 p. 231. Its intent is manifest, to prevent the Legislature from being deceived in regard to any measure for levying taxes, and from furnishing money that might by some indirection be used for objects not approved by the Legislature. Inasmuch as the Constitution in another place confines all statutes to single objects, the restriction is less important than under the old Constitution. It must receive a reasonable construction to carry out its design. The statute in question does not, we think, violate that design. The tax, it is admitted, is definite enough. It is to be received by the county treasurer of each county and placed by him to the credit of the contingent fund of the township, city or village from which it is collected, and paid over to the proper local officer to be used for the purposes of that fund. Pub. Acts 1879, p. 297.

We can see no reason why the increase of the contingent fund of a corporation is not a specific object. The Constitution certainly does not contemplate, but rather forbids, any reference to a city or village charter in terms; and it would be a gross abuse to insert in such a statute as this a copy of the multifarious purposes of a contingent fund, mentioned in any or all of the local charters at length. There is no uncertainty in a provision which names the classes of beneficiaries, and devotes the taxes to their use in a fund which is perfectly understood by every one as devoted to non-specified purposes, some of which could not be readily foreseen. If this objection is good it would be difficult to understand why a city charter allowing money to be paid into a contingent fund, would not come within similar difficulties. A nice objector might say that paying money over to a city or township for general purposes would be uncertain. We must treat these provisions sensibly, and not hypercritically; and when the purpose is named and unmistakable, and it is impossible for the Legislature to be misled concerning it, no other practical requirement can be found.

As the other objection applies to several amendments, and is of general importance, it requires a comparison of the Constitution in its various parts, and some reference to its antecedents, to determine it.   The resolution proposing the amendment in question was filed in the Executive Office March 30, 1875, and provided that it should be submitted to the people " at the next general election, to be held on the first Tuesday succeeding the first Monday in November, in the year 1876."   Pub. Acts 1875, p. 305.   Plaintiff claims that a general election was held in April, 1875, at which this amendment should have been submitted.

By article 20 of the Constitution, relating to the subject of amendments and revisions of the Constitution, it was provided that when amendments had been agreed to in proper manner by the Legislature " the same shall be submitted to the electors at the next general election thereafter, and if a majority of electors qualified to vote for members of the Legislature, voting thereon, shall ratify and approve such amendment or amendments, the same shall become part of the Constitution."

The question presented is what is meant by the term " general election."   The only way to determine this is to see whether there is anything in the Constitution itself bearing on the subject, and how far light can be had in case of doubt from other sources.

The first thing to be looked at is the provision in the schedule whereby this Constitution itself was to be submitted to a popular vote.   By § 16 of the schedule it was ordered that " this Constitution shall be submitted to the people for their adoption or rejection, at the general election to be held on the first Tuesday of November, eighteen hundred and fifty ; and there shall also be submitted for adoption or rejection, at the same time, the separate resolution in relation to the elective franchise; and it shall be the duty of the secretary of state, and all other officers required to give or publish any notice in regard to the said general election, to give notice, as provided by law in case of an election of

governor, that this Constitution has been duly submitted to the electors at said election." A subsequent election authorized all persons to vote on it who were qualified to vote for members of the Legislature, and for a canvas of votes as for governor. By section 2 of article 20 the amendments were made to take effect at the beginning of the next year.

The resolution which was voted on with the Constitution, referred to the "next general election" as the time of voting.

By § 34 of article 4 it was declared that "the election of senators and representatives, pursuant to the provisions of this Constitution, shall be held on the Tuesday succeeding the first Monday of November, in the year eighteen hundred and fifty-two, and on the Tuesday succeeding the first Monday of November of every second year thereafter." By article 5 the governor and lieutenant-governor were required to be elected at the same time with members of the Legislature.

By § 20 of article 6, the election of circuit judges was to be held on the first Monday of April, 1851, and every sixth year thereafter; and whenever new circuits were created, the successors of the additional judges were to be chosen "at the regular election herein provided."

By article 8 the state officers were to be chosen "at each general biennial election."

By article 11 township officers were to be elected annually on the first Monday of April. By article 13, § 6, regents of the University were to be elected in each judicial circuit "at the time of the election of the judge of such circuit." By section 9 of the same article it was provided that "there shall be elected at the general election in 1852" three members of a State board of education, "and at each succeeding biennial election" one member, to hold office for six years.

By article 15 any banking law was to be submitted at "a general election."

It will be seen from all this that under the Constitution there was only one election which was ever referred to as a general election, and that the term was used as identical with the November election, which was previously annual, and thereby made biennial. That was the only election held sim-

ultaneously throughout all the State for officers to represent
the whole State. At that election the governor and all the
State officers throughout all the State, and the senators and
representatives in the State Legislature, except in the Upper
Peninsula, were chosen. The only other elections referred
to were the annual town meetings, and the sexennial circuit
elections for circuit judges and regents, in which the Upper
Peninsula was separated from the rest of the State for judicial
purposes, and attached to Wayne county for the election of
a regent for the third circuit. It is also worthy of remark
that under the old Constitution (article 13) amendments
might be submitted to vote at any time and in any manner
determined by the Legislature. The change, therefore, can-
not be regarded as accidental or without meaning, and the
general election contemplated was regarded as important.
And it appears from the Convention Debates not only that
an attempt was made to leave the time and manner of voting
for the Legislature to fix, but also that it was understood no
amendment could be voted on under the Constitution as it
stands except at the November election to be held biennially.
Convention Debates, 466, 467. No amendment of the Con-
stitution has been made which denominates any other election
in the same way. We have no means of knowing what were
the reasons which led the several members of the Constitu-
tional Convention to prefer a submission at the fall election.
It may be presumed it was an idea, which facts have always
warranted, that more votes are cast at that election than at
other times. And when the Constitution went into operation
there was no other election held annually or biennially in all
of the cities.

It is hardly necessary to say that subsequent legislation
could not change the meaning or effect of any part of the
Constitution. That instrument can only be changed by the
combined action of the Legislature and the people. If the
Legislature could, by merely calling things by particular
names, alter constitutional provisions, it would be quite unnec-
essary to consult the people on the subject of amendments.
The only foundation for any notion that the spring elections

can serve the purpose of the general election mentioned in the Constitution is that in organizing the present Supreme Court in 1857 the statute declared that a "general election" should be held on the first Monday in April every second year for the election of judges. Sess. Laws 1857, p. 390. Of course, the Legislature can make their own definitions for statutory purposes, but this would not change the constitutional definition, or make it apply to any election not within the constitutional contemplation.

It is also important to consider that while under the Constitution of 1835 the Legislature could appoint elections to be held at any time to vote on amendments, which in a certain sense would be general in the same way with the judicial election under the law of 1857, yet the statutes always distinguished the general election in the fall from all the rest. In the chapter on construction of statutes, found in the Revision of 1838, it is declared that the words "general election" shall be construed to mean the election in November. Rev. Stat. 1838, p. 3. The same idea is expressed in the Revision of 1846, which was in force when the Constitution of 1850 was adopted. Rev. Stat. 1846, p. 37. The Legislature of 1851, whose duty it was made to adapt the laws to the new Constitution, passed two separate laws on elections. The first (Sess. Laws 1851, p. 20) is entitled "An act to provide for the election of circuit judges and regents of the University," and provides for the canvassing of the votes by the State canvassers, as well as for the general and special methods of election. The second (p. 281) is entitled "An act to provide for holding general and special elections," and covers the whole subject of elections. In that act the November election is spoken of throughout as the general election, and vacancies in the offices of circuit judge and regents as well as others were to be filled at that election, and since 1857 it has been amended so as to include vacancies in the Supreme Court. Pub. Acts 1875, p. 22.

The first amendments adopted under the Constitution of 1850 were adopted by the Legislature of 1859, two years after the statute of 1857. Sess. Laws 1859, pp. 1100, 1102,

1105. All of these were expressly required to be submitted to vote at the next general biennial election, which was not held till 1860, and all of them were then ratified by popular vote, and have since been regarded and acted on as part of the Constitution. A question arose in the Legislature of 1859 whether the election for Supreme Court judges was not the next general election. The opinion of Mr. Howard, as attorney-general, was asked, and he reported his views at length, holding that the November election was the only one at which amendments could be voted on. House Journal 1859, p. 123. After a full consideration of the matter, this view was accepted as correct, and all the amendments which have since been acted on have been submitted in the same way, until in 1875 the Legislature adopted and submitted for action in 1876, when it was ratified, a change which allowed submission to the people either in the spring or fall, as should be determined. Pub. Acts 1875, p. 310. In the meantime amendments have been proposed and voted on continuously upon the construction put upon the Constitution in 1859. See Sess. Laws 1861, pp. 588, 589, 590, 591; Sess. Laws 1865, pp. 779, 794; Sess. Laws 1869, pp. 424, 425, 426, 427, 428, 431; Sess. Laws 1870, p. 13; Sess. Laws 1871, pp. 398, 404; Sess Laws 1874, pp. 11–35.

Many of these amendments have been confirmed and legislation has been had under them, and no one has hitherto doubted their validity.

We think the language of article 20 of the Constitution, taken with all the various other provisions which refer to general elections, very plainly refers to the fall election, and that the practical construction put upon it is correct and binding.

We therefore are of opinion that the amendment of 1875 was properly submitted and became a part of the Constitution by the vote of the people in 1876.

The judgment of conviction must be affirmed.

The other Justices concurred.