63   289
e68   67

CHARLES BOTT ET AL., PLAINTIFFS IN ERROR, v.
GEORGE WURTS, SECRETARY OF STATE, DEFEND-
ANT IN ERROR.

Argued March 14, 1899—Decided June 19, 1899.

1. The judicial department of the government has the right to consider
whether the legislative department and its agencies have observed
constitutional injunctions in attempting to amend the constitution, and
to annul their acts in case they have not done so.
2. The statute which provided for submitting proposed constitutional
amendments to the people empowered the governor of the state to
appoint a commission to ascertain the result of the popular vote, and
authorized him to proclaim that result. *Held*, that, at the instance of
a citizen of the state, the Supreme Court had power to review by *cer-
tiorari* the determination of the commission, notwithstanding the
proclamation of the governor.
3. In determining whether a proposed constitutional amendment was
approved and ratified by "a majority of the electors qualified to vote
for members of the legislature voting thereon," only those electors
who lawfully vote for or against the amendment are to be considered.
4. *Quære.* Whether the constitution directs that when several proposed
amendments are submitted to the people, they shall be so submitted
that the electors may vote for or against any amendment without
voting upon any other amendment. But, assuming that it does, it is
too late to question the election because of an ambiguity on this point
in the submitting statute, when the election has proceeded throughout
the state without objection on the part of any person, and every
qualified elector who desired to exercise his franchise has done so
without seeking to vote on some of the amendments while refraining
from voting on the rest.

On error to the Supreme Court. For opinion of the
Supreme Court see 33 *Vroom* 107.

For the plaintiffs in error, *William D. Edwards, Allan L.
McDermott* and *John P. Stockton.*

For the defendant in error, *Samuel H. Grey,* attorney-
general.

The opinion of the court was delivered by

DIXON, J.    Article 9 of the constitution of New Jersey, ratified by the people August 13th, 1844, is as follows:

"Any specific amendment or amendments to the constitution may be proposed in the senate or general assembly, and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their journals, with the yeas and nays taken thereon, and · referred to the legislature then next to be chosen, and shall be published for three months previous to making such choice, in at least one newspaper of each county, if any be published therein; and if, in the legislature next chosen as aforesaid, such proposed amendment or amendments, or any of them, shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the legislature to submit such proposed amendment or amendments, or such of them as may have been agreed to as aforesaid by the two legislatures, to the people, in such manner and at such time, at least four months after the adjournment of the legislature, as the legislature shall prescribe; and if the people, at a special election to be held for that purpose only, shall approve and ratify such amendment or amendments, or any of them, by a majority of the electors qualified to vote for members of the legislature voting thereon, such amendment or amendments so approved and ratified shall become part of the constitution; provided, that if more than one amendment be submitted, they shall be submitted in such manner and form that the people may vote for or against each amendment separately and distinctly; but no amendment or amendments shall be submitted to the people by the legislature oftener than once in five years."

The legislatures of 1896 and 1897 having regularly agreed to three proposed amendments, one of which related to lotteries, another to appointment to office, and the third to woman suffrage, an act was passed and approved May 25th, 1897, for submitting these amendments to the people of the state. This act, after providing for the transmission to the

secretary of state of certificates showing the results of the voting in the several election precincts throughout the state, enacts as follows :

· " It shall be the duty of the governor to summon to attend him, on the nineteenth day of October next, four or more of the members of the senate, who shall meet on said day of October, in the senate chamber, in the city of Trenton, at the hour of two o'clock P. M., and they, with the governor, shall constitute a board of state canvassers to canvass and estimate the votes given for and against each of said amendments; and the said board of state canvassers shall proceed to organize and determine the result according to the provisions of the act entitled 'An act to regulate elections,' approved April 18th, 1876, so far as they are applicable ;   *   *   *   the said board of state canvassers shall determine and declare which of said proposed amendments have been adopted, and shall forthwith deliver a statement of the result as to each amendment to the secretary of state of this state, to be filed in his office as an official paper, and · any proposed amendment which, by said certificate and determination of the board of state canvassers, shall appear to have received in its favor a majority of all the votes cast in the state for and against said proposed amendment shall, from the time of filing such certificate, be and become an amendment to and part of the constitution of this state ; and it shall be the duty of the governor of this state forthwith, after such determination, to issue a proclamation declaring which of said proposed amendments have been adopted by the people."

The board of state canvassers, provided for as above, having on October 19th, 1897, filed in the office of the secretary of state a statement of the result of the election and its determination and declaration that the proposed amendments relating to lotteries and to appointment to office were adopted, and that the proposed amendment relating to woman suffrage was rejected, and the governor, on October 26th, 1897, having issued a proclamation declaring that the said amendments relating to lotteries and to appointment to office had been

adopted by the people and become part of the constitution of the state, the Supreme Court, on December 3d, 1897, at the instance of Charles Bott and others, citizens and taxpayers of the state who voted upon said proposed amendments, allowed a writ of *certiorari* to remove into that court for review the statement of the result of the election, made by the state board of canvassers, touching the proposed amendment relating to lotteries, in order that it might be judicially decided whether, on the facts shown in that statement, the board of canvassers had legally determined that the said proposed amendment was adopted.

Upon proper return to that writ and due proceedings and argument, the Supreme Court considered the reasons urged by the prosecutors against the legality of the determination of the state board of state canvassers, and decided (1) that their determination was legal, and (2) that the concurrence of the board of state canvassers and the executive department of the government, in their respective official functions, placed the subject-matter of complaint beyond the cognizance of the judicial department of the government; and upon each of these grounds adjudged that the writ should be dismissed.

This judgment is now before us on writ of error.

The question naturally arising first in this case concerns the legitimate scope of our inquiry: have we authority to consider and decide whether the determination of the board of state canvassers, that the proposed amendment had been adopted, was lawful, or did that determination, followed by the proclamation of the governor, preclude judicial cognizance of the subject?

In dealing with this question it is well to note its real character.

*First.* The objections urged by the prosecutors against the legality of the determination of the board rest upon the express provisions of the constitution, they being, that the act by which the proposed amendments were submitted to the people did not submit them " in such manner and form that the people might vote for or against each amendment sepa-

rately and distinctly," as the constitution directs, and that the lottery amendment, according to the statement of the result of the election made by the board and brought before the court by the writ of *certiorari*, was not approved and ratified by a majority of the electors qualified to vote for members of the legislature voting thereon, as likewise the constitution requires.

*Secondly.* It should be observed that neither the board of canvassers nor the governor was. exercising a function devolved upon them by the constitution; each derived authority wholly from the statute. The powers conferred upon them might as well, if the legislature had so willed, have been cast upon any other body. Thus, by act of congress under the federal constitution, which is no more inexplicit on this topic than ours, substantially the same functions of determination and promulgation are to be performed by the secretary of state. *U. S. Rev. Stat.* 1873–4, § 205.

*Thirdly.* The present proceeding is one of direct, not collateral, review. Even if it be conceded that, whenever the validity of this proposed amendment as a part of the constitution was incidentally assailed, conclusive effect would be given to the action of these statutory authorities, so far as that action had not been overturned, yet it would by no means follow that their action could not in this proceeding be questioned and annulled. The determination of every legal tribunal, appearing to be within its jurisdiction, though impregnable by collateral attack, is subject to reversal by appeal.

*Fourthly.* The subject for consideration was brought by legal process before that tribunal, the Supreme Court, which in our system of government possesses the judicial power, if it resides anywhere, of reviewing and setting aside, when illegal, the conclusions of statutory tribunals.

It thus becomes manifest that there was present in the Supreme Court, and is now present in this court, every element tending to maintain jurisdiction over the subject-matter, unless it be true, as insisted, that the judicial department of the government has not the right to consider whether the

legislative department and its agencies have observed constitutional injunctions in attempting to amend the constitution, and to annul their acts, in case they have not done so.

That such a proposition is not true seems to be indicated by the whole history of jurisprudence in this country. :

In New Jersey the judicial authority was thus declared by Chief Justice Beasley in *State* v. *Rogers,* 27 *Vroom* 480, 616, and on this point he was delivering the opinion of every justice of the Supreme Court: "When the inquiry is whether, the legislature or any other body or officer has violated the regulations of the constitution, it is entirely plain that the decision of that subject must rest exclusively with the judicial department of the government." In that case the right of the court to determine which body of men constitutionally composed the senate of the state, was vindicated. On the same principle the Supreme Court in *State* v. *Pritchard,* 7 *Vroom* 101, maintained its right to annul an act of the executive, who, under an erroneous view of the law, had decided that a vacancy existed in certain offices which, in case of vacancy, he had the constitutional power to fill. These precedents, and the frequently-exercised power of our courts to defeat unconstitutional statutes, illustrate the wide extent of judicial authority in New Jersey in guarding and enforcing constitutional mandates.

For the exercise of that authority with regard to an attempted amendment of the constitution, in conformity with the express provisions of that instrument, no occasion has heretofore arisen in this state; but we perceive no good reason for excluding such a case from the general principle. If a legislative enactment, which may be repealed in a year, or an executive act, which affects only a single individual, cannot be allowed to stand if it contravenes the constitution, *a fortiori* a change in the fundamental law, which is much more permanent and affects the whole community, should not be permitted to take place in violation of constitutional mandates.

In other states of the union the decisions on this special phase of the doctrine are numerous and substantially to the same purport.

In *State* v. *McBride,* 4 *Mo.* 303 (1836), which arose on *quo warranto* to determine whether the defendant's office had not been vacated by an amendment of the constitution, the state insisted that, as the amendment had been promulgated by the general assembly as one duly adopted, the court was bound to receive it as such ; but the court held otherwise, and ascertained for itself whether the supposed amendment had been properly adopted.

In *Collier, Governor,* v. *Frierson,* 24 *Ala.* 100 (1854), a suit upon the bond of the state treasurer, where the question was whether the state constitution had been amended so as to enlarge the treasurer's official term, the court said (at *p.* 109) : "We entertain no doubt that to change the constitution in any other mode than by a convention, every requisition which is demanded by the instrument itself must be observed, and the omission of any one is fatal to the amendment. We scarcely deem any argument necessary to enforce this proposition. The constitution is the supreme and paramount law. The mode by which amendments are to be made under it is clearly defined. It has said that certain acts are to be done, certain requisitions are to be observed, before a change can be effected. But to what purpose are these acts required or these requisitions enjoined, if the legislature or any other department of the government can dispense with them ? To do so would be to violate the instrument which they are sworn to support ; and every principle of public law and sound constitutional policy requires the court to pronounce against every amendment which is shown not to have been made in accordance with the rules prescribed by the fundamental law."

Likewise in *Trustees of University* v. *McIver,* 72 *N. C.* 76 (1875), the court said : " If it can be shown that these amendments or any of them have not been made in accordance with the rules prescribed by the fundamental law, every principle of public law and sound policy requires the court to pronounce against them."

In *Westinghausen* v. *People,* 44 *Mich.* 265 (1880), on indictment for violating a statute passed in 1879, the validity of

which depended on an amendment of the constitution adopted in 1876, the question was whether the legislature had submitted the proposed amendment to the people at the *next general election* after it had been agreed to by the legislature, as the constitution directed. Although this question had of course been decided by the legislature in the resolution submitting the amendment, the court considered and decided it as a judicial one.

In *State* v. *Swift,* 69 *Ind.* 505 (1880), the majority of the judges expressed the opinion that when, in the pursuance of a statute, the governor and secretary of state had proclaimed that a proposed amendment was duly ratified the matter became *res adjudicata,* that is, conclusive against collateral attack; but they decided that when there was no statutory provision for declaring the result of the election, the matter was open for judicial inquiry on trial of an indictment, and notwithstanding a proclamation by the governor to the contrary, they held that the proposed amendment had not been adopted because it had not been approved by a majority of all the electors of the state. Mr. Justice Niblack and Mr. Justice Scott, dissenting, thought that in any case the proclamation of the governor made no difference, and that approval by a majority of those voting had given validity to the amendment.

In *State* v. *Timme,* 54 *Wis.* 318 (1882), the court considered, as a subject for judicial inquiry, the question whether the legislature had exercised a legal discretion in determining what were distinct amendments for separate submission to the people.

In *Koehler & Lange* v. *Hill,* 60 *Iowa* 543 (1883), an action to recover the price of beer sold, which turned on an alleged amendment of the constitution, the matter received very elaborate consideration; and after a re-argument of the cause, in which counsel for the appellant contended (at *p.* 604) that " the judicial department of the state has no jurisdiction over political questions, and cannot review the action of the nineteenth general assembly, and of the people, in the matter of the adoption or amendment of the constitution of the state,"

Chief Justice Day delivered the judgment of the court in these words : " The authority opposed to the view advanced by appellant's counsel is most satisfactory and conclusive, and, so far as we have been able to discover, is without conflict. Not only must a constitution be amended in the manner prescribed in the existing constitution, but it is competent for the courts, when the amendment does not relate to their own powers or functions, to inquire whether, in the adoption of the amendment, the provisions of the existing constitution have been observed."

In *Oakland Paving Co.* v. *Hilton,* 69 *Cal.* 479 (1886), the court held that a proposed amendment of the constitution had not been legally adopted because it had not been entered on the journals of the houses, as the constitution required ; and in *Livermore* v. *Waite,* 102 *Id.* 113 (1894), the same court, at the instance of a citizen and taxpayer of the state, restrained the secretary of state from taking steps to submit to the people a proposed amendment agreed to by the legislature, on the grounds that the legislature had not acted in conformity with the constitution, and that the proposed amendment was of such a character that it could not properly become part of the constitution.

Other consistent decisions may be found cited in 6 *Am. & Eng. Encycl. L.* 901 *et seq.,* but the foregoing will suffice to indicate the various circumstances in which the principle of judicial authority has been maintained and applied. The examination made supports the assertion of Chief Justice Day that the decisions, so far as they deal with the existence of the principle, are not in conflict.

The only case found, in which the jurisdiction of the court was denied, is *Worman* v. *Hagan,* 78 *Md.* 152 (1893), and that denial was based on a provision of the existing constitution to the effect that the votes cast for and against a proposed amendment should be returned to the governor of the state, and if it should appear to him that a majority had voted in favor of the amendment, he was directed to declare by his proclamation that it had been adopted by the people,

and thenceforth it became a part of the constitution. Thus, the constitution, said the court, confided to the governor exclusively and without appeal to any other authority, the power and duty of ascertaining the result of the vote from an examination of the returns made to him. Therefore, the court declined to investigate the result of the voting. Nevertheless it considered and passed upon other objections made against the constitutional adoption of the amendment.

The cases cited in denial of the principle are those which grew out of the Dorr rebellion in Rhode Island, in 1841 and 1842. The question there presented was whether, on trial of an indictment or of civil actions between private parties, it might legally be shown that the old constitution of Rhode Island, under which the actual government of the state, including the courts, existed at the time of trial, had been supplanted by a new constitution under which no government had ever existed, and according to which the existing government was a usurpation. The courts decided in the negative and it is impossible to find a sensible ground for the opposite decision. But the difference between a court's investigation into the legality of the government of which the court is a branch, and its investigation into the legality of a procedure which in no way involves the legality of the government or of itself, is too plain to require elucidation. The cases referred to and others supposed to be even remotely relevant were fully discussed by Chief Justice Day in *Koehler & Lange* v. *Hill, ubi supra.* Further discussion would be supererogatory.

Having thus reached the conclusion that the subject-matter of this litigation is within the range of judicial cognizance, it remains to consider whether it has been brought into court by parties having such interest therein as rendered them legally competent to present it.

In *Ferry* v. *Williams,* 12 *Vroom* 332, the writer of this opinion endeavored to deduce from the prior cases the rule on which the Supreme Court had acted, in its discretionary allowance of prerogative writs for the redress or prevention of public wrongs at the instance of private suitors, and formu-

lated that rule in these words: " The Supreme Court may, in its discretion, at the instance of private persons, act by *mandamus, certiorari* or *quo warranto*, for the redress or prevention of public wrongs by public bodies and officers, whose official sphere is confined to some political division of the state, whenever the applicant is one of the class of persons to be most directly affected in their enjoyment of public rights, and the public convenience will be subserved by the remedy desired." Subsequent cases have been thought to require some modification of that statement, but very recently the Supreme Court, speaking through Mr. Justice Van Syckel in *Oliver* v. *Jersey City, ante p.* 96, has pointed out that only when the subject to be reviewed by *certiorari* is void, so that it could not be successfully pleaded against an indictment for a public wrong or a civil action for a private wrong, is the rule as stated inapplicable. No narrower rule than this will cover the adjudications in New Jersey.

The action of the board now under review is plainly not void. The constitution being silent as to the mode of ascertaining the result of the voting and of determining whether the proposed amendments had been adopted, it was within the ordinary functions of the legislature to create a tribunal for those purposes and to clothe it with appropriate powers. The determination of that tribunal became *quasi res adjudicata,* and until reversed in due course of law would conclude the matter. Only by the supervising authority of the Supreme Court would it be subject to review.

It is, therefore, necessary to consider merely whether the rule which holds in case of public bodies and officers, whose official sphere is confined to some political division of the state, should be extended to this board, whose official action affects the whole state equally.

We think on principle it should. The interest of every citizen of the state in upholding and protecting the constitution is of the same quality as the interest of the citizen of a municipality in upholding and protecting the municipal charter, and certainly is not less in degree. The same means,

therefore, should be afforded by law for its maintenance. No means adequate to the present circumstances can be suggested other than that employed by the prosecutors.

In our opinion the objections now to be examined are lawfully before us for adjudication.

The first claim of the prosecutors deserving attention is that, according to the statement of the result of the voting made by the board of state canvassers, the lottery amendment was not approved and ratified by the requisite majority of electors, and therefore the board's determination that it had been adopted was illegal.

By that statement it appears that the number of names on the poll lists was one hundred and forty-one thousand six hundred and seventy-two; that the number of ballots rejected was nine hundred and sixty-one; that the number of votes given for the lottery amendment was seventy thousand four hundred and forty-three, and the number of votes given against it was sixty-nine thousand six hundred and forty-two. The prosecutors insist that a majority of all the voters, as shown by the names on the poll lists, or at least a majority of all those who cast ballots, whether the ballots were for or against any amendment or were rejected, was necessary for adoption.

We do not so interpret the constitution. Its words are " a majority of the electors qualified to vote for members of the legislature voting thereon," and in the following clause it speaks of those voting " for or against each amendment." Evidently only those voting for or against an amendment are to be deemed those voting thereon. By the words " electors voting thereon " are intended the electors who exercise the right of suffrage in such manner that their votes should under the law be counted for or against the proposition submitted; and although the number of names on the poll lists may represent the number of qualified electors who attempted to vote, and the rejected ballots may all have been official ballots cast by some of these qualified electors, still it may be that not all of those qualified electors voted, in the constitutional sense,

and that the rejected ballots were not votes. If, for example, an elector presented to the election officer and the officer deposited in the ballot-box two or more official ballots rolled or folded together, and in canvassing the votes the ballots were so found, those ballots would under the law be null and void, and the elector would not have voted on any of the amendments. Now, in the absence of evidence to the contrary, the presumption is that the election officers acted rightly and therefore that the rejected ballots were rejected for legal cause and were not votes for or against any amendment, that all the votes legally capable of being counted for or against the lottery amendment were one hundred and forty thousand and eighty-five, and that only so many qualified electors voted thereon, of whom a majority approved and ratified it.

It is deemed useless to refer to decisions elsewhere, enforcing a different method of computation, because they turn on different language in the constitution. The meaning of our own constitution seems plain.

The other objection urged by the prosecutors is that the act providing for the submission of the amendments to the people prescribed such a method of voting—that while every voter was at liberty to vote for any amendment and against the others, or *vice versa,* no elector could vote on any amendment unless he voted on all. This, it is contended, was not submitting the amendments " in such manner and form that the people might vote for or against each amendment separately and distinctly."

Assuming the effect of the statute to be as alleged, it is not clear that it would antagonize the constitution. There is, indeed, a sense in which, under such a law, the people could not vote for or against each amendment separately and distinctly—that is, they would be required to determine how they would vote on any amendment in conjunction with a determination as to how they would vote on each of the others. But in another and an important sense they could vote for or against each separately and distinctly—that is, a

determination to vote for or against any one left them entirely free to determine how they would vote on each of the others.

In which of these senses the constitution should be taken is doubtful, and the members of the court are not as one about it; and, under the established rule that courts will not condemn a statute as unconstitutional unless its repugnancy to the constitution be clear, we would hesitate to adjudge this enactment invalid.

But there is another reason to withhold us from such a judgment. Under the statute the election proceeded through-but the state without objection on the part of any person, and, so far as appears, every qualified voter who desired to exercise his franchise has done so in a mode satisfactory to himself, without seeking to vote on some of the amendments while refraining from voting on the rest. So that no right has been denied; no will competent to influence the election has been thwarted, and the discrepancy between the statute and the constitution, if there be any, has proved to be of no practical moment. Under these circumstances we think the same public policy which permitted the prosecutors to present the supposed public grievances now requires us to declare that this is not such a grievance, and the theoretical objection has been waived.

The other matters mentioned in the reasons for reversal filed by the prosecutors do not appear on the statement of the result of the election and the determination of the board thereon, which alone are brought into court for adjudication, and therefore they cannot be considered.

We find no error in the determination of the board that the lottery amendment was adopted, and consequently the judgment of the Supreme Court maintaining it should, on the grounds above stated, be affirmed.

GUMMERE, J. When the plaintiff in error first applied to the Supreme Court for the writ of *certiorari* in this case, its allowance was opposed by Mr. Justice Van Syckel upon the ground that the question whether or not an amendment had

been adopted into our state constitution was a political, not a judicial one. *Bott* v. *Secretary of State*, 32 *Vroom* 163. I concur in the views expressed in the opinion delivered by him.

On the merits of the case I concur in the opinion of Mr. Justice Depue, delivered in the Supreme Court on the final hearing of the cause. 33 *Vroom* 107.

I shall therefore vote to affirm the judgment under review for the reasons contained in those opinions.

I am authorized to state that Chief Justice Magie and Mr. Justice Lippincott vote to affirm the judgment for the same reasons.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, COLLINS, DIXON, GUMMERE, LIPPINCOTT, ADAMS, BOGERT, HENDRICKSON, NIXON, VREDENBURGH. 11.

*For reversal*—None.