DUKESHERER FARMS, INC. v DIRECTOR OF THE DEPARTMENT
OF AGRICULTURE

1. TAXATION—PURPOSE—PUBLIC PURPOSE—RAISING REVENUE—PUBLIC
   BENEFITS.
   Taxes are imposed for a public purpose as a means of raising
   revenue for the general benefit of the public as a whole.

2. TAXATION—SPECIAL ASSESSMENTS.
   Special assessments are motivated by private purposes upon the
   assumption that a portion of the community is to be specially
   and peculiarly benefited in the enhancement of the value of
   property peculiarly situated as regards a contemplated expendi-
   ture of public funds and they demand that special contribu-
   tions, in consideration of the special benefit, shall be made by
   the persons receiving it.

3. AGRICULTURE—TAXATION—SPECIAL ASSESSMENTS—AGRICULTURAL
   COMMODITIES MARKETING ACT—CHERRY PROMOTION AND DEVEL-
   OPMENT PROGRAM—STATUTES.
   The funds collected by the Michigan Cherry Promotion and
   Development Program pursuant to the Agricultural Commodi-
   ties Marketing Act are special assessments and not taxes where
   they confer a distinct benefit upon the cherry producers who
   are assessed such funds for the establishment of marketing
   programs by providing assistance in marketing and processing
   and thereby creating a greater demand for the cherries (MCLA
   290.651 *et seq.;* MSA 12.94[21] *et seq.).*

4. CONSTITUTIONAL LAW—AGRICULTURE—AGRICULTURAL COMMODITIES
   MARKETING ACT—SPECIAL ASSESSMENTS—TAXES—STATUTES.
   The purpose for the collection of assessments pursuant to the

REFERENCES FOR POINTS IN HEADNOTES
[1] 71 Am Jur 2d, State and Local Taxation §§ 3, 42 *et seq.*
[2] 70 Am Jur 2d, Special or Local Assessments § 10.
   71 Am Jur 2d, State and Local Taxation § 59.
[3] 71 Am Jur 2d, State and Local Taxation § 60.
[4] 71 Am Jur 2d, State and Local Taxation §§ 22, 192.
[5, 6] 3 Am Jur 2d, Agriculture § 19 *et seq.*
[7, 8] 3 Am Jur 2d, Agriculture § 34.

Agricultural Commodities Marketing Act is stated clearly enough in the act to comply with the constitutional mandate that every law which imposes, continues, or revives a tax, shall distinctly state the tax (Const 1963, art 4, § 32, MCLA 290.651 *et seq.;* MSA 12.94[21] *et seq.).*

5. AGRICULTURE—AGRICULTURAL COMMODITIES MARKETING ACT—CONSTITUTIONALITY—STATUTES.

The Agricultural Commodities Marketing Act is not unconstitutional and is not an improper delegation of the legislative taxing authority (MCLA 290.651 *et seq.;* MSA 12.94[21] *et seq.).*

6. AGRICULTURE—TAXATION—LEGISLATIVE TAXING AUTHORITY—AGRICULTURAL COMMODITIES MARKETING ACT—SPECIAL ASSESSMENTS—STATUTES.

It is not an improper delegation of the legislative taxing authority for the Agricultural Commodities Marketing Act to provide for the assessment of producers pursuant to a program established through the act where the maximum rate of assessment and method of collection are included in the program and the disbursements under the program are limited to necessary expenses; it is not necessary to state the rate or formula of computation any more distinctly than this (MCLA 290.651 *et seq.;* MSA 12.94[21] *et seq.).*

7. AGRICULTURE—DELEGATION OF LEGISLATIVE POWER—AGRICULTURAL COMMODITIES MARKETING ACT—DEPARTMENT OF AGRICULTURE—STATUTES.

It is not an unconstitutional delegation of legislative power for the Agricultural Commodities Marketing Act to delegate to the Department of Agriculture the task of determining whether a proposed program complies with the standards expressed in the act (MCLA 290.651 *et seq.;* MSA 12.94[21] *et seq.).*

8. AGRICULTURE—DELEGATION OF LEGISLATIVE POWER—AGRICULTURAL COMMODITIES MARKETING ACT—POWER OF APPROVAL—STATUTES.

It is not an unconstitutional delegation of legislative power to involve industry members in the development of a program under the Agricultural Commodities Marketing Act and pertaining to the industry where the power of approval over the program has been retained by an administrator or director (MCLA 290.651 *et seq.;* MSA 12.94[21] *et seq.).*

Appeal from Berrien, William S. White, J. Sub-

mitted June 10, 1976, at Grand Rapids. (Docket No. 26699.) Decided January 6, 1977. Leave to appeal granted, 400 Mich —.

Complaint by Dukesherer Farms, Inc., for itself and on behalf of all cherry producers in the state, against B. Dale Ball, Director of the Department of Agriculture and the Michigan Cherry Promotion and Development Committee, for review of agency proceedings and a declaratory judgment. The Michigan Association of Cherry Producers was permitted to intervene as a defendant. Judgment for defendants. Plaintiff appealed by leave granted. Affirmed, 53 Mich App 489 (1974). The Supreme Court granted leave to appeal and *sua sponte* reversed the Court of Appeals and remanded the case to the trial court for trial, 393 Mich 758 (1974). The trial court granted summary judgment for the defendants. Plaintiff appeals. Affirmed.

*Warner, Norcross & Judd* (by *Ernest M. Sharpe)*, for plaintiff.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Susan A. Harris,* Assistant Attorney General, for B. Dale Ball.

*Foster, Swift & Collins, P. C.* (by *James A. White) (Peter F. McNenly,* of counsel), for intervening defendant.

Before: R. B. BURNS, P. J., and M. J. KELLY and S. S. HUGHES,* JJ.

M. J. KELLY, J. Plaintiff appeals on behalf of itself and all other cherry producers in the State of Michigan. This action originally began in 1972

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

when plaintiff filed a class action seeking a permanent injunction against actions by the defendants in carrying out the Michigan Cherry Promotion and Development Program (hereinafter referred to as "Program") instituted pursuant to the Agricultural Commodities Marketing Act (hereinafter referred to as the "Act"), MCLA 290.651, *et seq.;* MSA 12.94(21), *et seq.* The complaint further sought a declaration that the Act and Program are unconstitutional.

After the Michigan Association of Cherry Producers was permitted to intervene as a defendant, the circuit court granted defendants' and intervening defendant's motions for accelerated judgment on the ground that plaintiff's petition was untimely filed. This Court affirmed in *Dukesherer Farms, Inc v Director of the Department of Agriculture,* 53 Mich App 489; 220 NW2d 46 (1974). The Supreme Court reversed and remanded the case to the circuit court for consideration of the constitutional challenges. 393 Mich 758; 223 NW2d 294 (1974).

In the circuit court plaintiff moved for summary judgment on the ground that the Act is unconstitutional on its face because it improperly delegates general legislative and taxing powers, and fails to state distinctly the tax it assessed, all in violation of the Michigan Constitution. The circuit court denied plaintiff's motion and granted summary judgment for defendants, holding the Act constitutional.

The Act provides the procedure to establish marketing programs for a variety of agricultural products. A marketing program is defined as:

"a program established by order of the director pursuant to this act, prescribing rules and regulations governing the marketing for processing, distributing,

selling, or handling in any manner of any agricultural commodity produced in this state during any specified period and which he determines would be in the public interest." Section 2.

Section 3 of the Act specifies what the contents of the programs may contain:

"(a) Provisions for establishing advertising and promotional programs.

"(b) Provisions for establishing market development programs.

"(c) Provisions for establishing and supporting supplemental research programs designed to improve the market acceptability of the specific commodity and contribute to the effectiveness of the program.

"(d) Provisions for development and dissemination of market information.

"(e) Provision for contracting with organizations, agencies or individuals for carrying out any of the above activities.

"(f) Provisions for:

"(1) Establishing standards for quality, condition or size for agricultural commodities sold as fresh products for resale or processing and standards for pack and/or container for commodities sold for use as fresh products.

"(2) Inspection and grading of the fresh commodity in accordance with the grading standards so established.

"(g) Provision for determining the existence and extent of any surplus in any marketing period, for any commodity or product, or of any grade, size, or quality thereof, and providing for handling and equitably sharing the cost of such surplus handling among the producers of the commodity. Before provisions under this paragraph are included in any marketing program, particular attention shall be given to determining that Michigan producers affected by the provisions produce a sufficient proportion of the product covered by the provisions for the program to be effective in the particu-

lar market toward which the provisions would be applicable.

"(h) Provision for payment for all usable products purchased from producers according to established grades.

"(i) Provision for exemption of nonparticipating producers."

The funding for any and all such programs established is through special assessments collected "from each producer of any marketable agricultural commodity * * * directly affected by a marketing program", MCLA 290.655; MSA 12.94(25)(a). These assessments, as stated in the Act, are to be used to defray program and administrative costs. Furthermore, each marketing program must specify the maximum assessment needed to cover the program's expenses, MCLA 290.655; MSA 12.94(25)(b).

Section 8(a) of the Act provides:

"Any moneys collected pursuant to this act shall not be state funds and shall be deposited in a bank or other depository in this state, allocated to the marketing program under which they are collected, and disbursed only for the necessary expenses incurred with respect to each such separate marketing program, in accordance with the rules established under the program."

And, § 9 contains the refund procedure in the case of excess funds at the close of any marketing season.

Sections 10 through 12 of the Act detail the procedure to be followed in the institution of a marketing program. The Director of the Michigan Department of Agriculture (defendant) must receive a petition signed by a certain percentage of producers of the commodity calling for adoption of a particular marketing program. The director

must then notice up and hold a public hearing on the proposed program.

Within 45 days of the close of the hearing the director must issue a decision based on his or her findings and recommend approval or disapproval of the proposed findings. This recommendation must contain the text of the proposed program and be supported by evidence obtained at the hearing.

If the director recommends adoption of a program, a referendum of affected producers and processors is required within 45 days. The program becomes effective:

"(a) If 66-2/3% or more by number of those voting representing 51% or more of the volume of the affected commodity produced by those voting assent to the proposal. [or]

"(b) If 51% or more by number of those voting representing 66-2/3% or more of the volume of the affected commodity produced by those voting assent to the proposal." MCLA 290.661; MSA 12.94(31).

Section 15 of the Act requires that adopted marketing programs include a definition of terms, statement of purpose of the program, maximum rate of assessment, method of collection, nominating procedure, qualifications, representation and size of the committee and other necessary provisions.

All parties to this case agree that the Michigan Cherry Promotion and Development Program presently under attack meets all of the requirements specified in MCLA 290.665; MSA 12.94(35). It provides for an assessment of $3.75 per ton for tart cherries; $3.00 per ton for sweet cherries; $1.25 per ton for both tart and sweet cherries when sold for juice purposes. The program provides the assessments be collected by the cherry processors and

remitted to the Michigan Cherry Promotion and Development Committee. The provisions of the program, including the assessments, received the approval of the requisite number of cherry producers in a referendum conducted in March, 1972. The program was put into effect and operated until this suit was filed.

I

TAX OR ASSESSMENT

The key to determining the constitutionality of the Marketing Act is to decide whether the funds collected in support of the cherry program are "assessments" or "taxes". *Knott v City of Flint,* 363 Mich 483; 109 NW2d 908 (1961).

The Marketing Act establishes the statutory basis for the cherry program. The funding provision, MCLA 290.655; MSA 12.94(25) states:

"(a) Assessments shall be collected from each producer of any marketable agricultural commodity produced in this state and directly affected by a marketing program issued for the commodity to defray all program and administrative costs * * * .

"(b) Each program shall specify the maximum assessment to be collected to cover program and administrative costs.

"(c) For convenience the processors, distributors or handlers of the commodity may be required to collect and remit producer assessments. Processors, distributors or handlers paying the assessments for any producer may deduct the amount from any moneys which they owe to the producers."

Taxes are imposed for a public purpose, not the private purposes motivating assessments; taxation is a means of raising revenue for the general benefit of the public as a whole. *People ex rel the*

*Detroit & Howell R Co v Salem Township Board,*
20 Mich 452, 574 (1870), *Knott, supra.*

On the other hand:

"Special assessments * * * are made upon the as-
sumption that a portion of the community is to be
specially and peculiarly benefited, in the enhancement
of the value of property peculiarly situated as regards a
contemplated expenditure of public funds; and, in addi-
tion to the general levy, they demand that special
contributions, in consideration of the special benefit,
shall be made by the persons receiving it." *Fluckey v
City of Plymouth,* 358 Mich 447, 453; 100 NW2d 486,
489 (1960), relying on 2 Cooley, Taxation (3d Ed), pp
1153, 1154.

Plaintiff-appellant cites *Miller v Michigan State
Apple Commission,* 296 Mich 248; 296 NW 245
(1941), as authority for the proposition that assess-
ments for advertising and research (like the assess-
ment here in question) are taxes because they
provide a source of revenue, are not incidental to
regulation of an industry and benefit the general
welfare of the state. However, in *Miller,* the ques-
tion of whether the levy was an assessment or a
tax was not at issue. The Marketing Act was
designed to regulate the establishment of market-
ing programs; its purpose is to finance the opera-
tion of such programs, not to generate revenue.

As the circuit court found, the funds appear to
be generated for the specific and narrowly defined
purposes outlined in § 3 of the Marketing Act. A
distinct benefit is conferred on cherry producers;
namely, assistance in marketing and processing to
produce a greater demand for cherries.

Section 5(b) of the Act dictates that each pro-
gram specify the maximum assessment to be col-
lected. Disbursements are limited to "necessary

expenses". Section 8(a). The maximum rate of assessment and method of collection must be included in the proposed program.

Even if this were a tax it is not obscure or deceitful. The purpose is stated clearly enough to comply with *Westinghausen v People,* 44 Mich 265, 266–267; 6 NW 641 (1880).

The intent of Const 1963, art 4, § 32 (former Const 1850, art 14, § 14) is:

" * * * to prevent the Legislature from being deceived in regard to any measure for levying taxes, and from furnishing money that might by some indirection be used for objects not approved by the Legislature." *Westinghausen, supra,* p 267.

The expansion of government has led this Court to comment on the delegation problem in *State Highway Commission v Vanderkloot,* 43 Mich App 56; 204 NW2d 22 (1972), *aff'd,* 392 Mich 159; 220 NW2d 416 (1974):

"It has become impossible for the Legislature to deal directly with the host of details involved in the varied and complex situations on which it legislates, and, consequently, it has increasingly found it necessary to leave them to the reasonable discretion of administrative officers. It is important to understand that the prohibition against the legislature's delegation of its lawmaking powers does not mean that it cannot confer a power of discretion in the administration of the law itself. It is said that the bestowing of such discretion does not become an unconstitutional delegation of a legislative function where its exercise is controlled and guided by adequate standards in the statute authorizing it." (Citations omitted.) 43 Mich App at 61–62.

"The exigencies of modern government have led to judicial approval of the use of broad standards and liberal grants of discretion to administrative agencies. Courts have recognized the fact that in particular situa-

tions detailed standards in precise and unvarying form could prove wholly unrealistic, and more arbitrary than a general indefinite one. 1 Am Jur 2d, Administrative Law, § 118, p 925. *Ward v Scott,* 11 NJ 117, 123–124; 93 A2d 385, 388 (1952); *Swisher v Brown,* 157 Colo 378, 389; 402 P2d 621, 627 (1965). 43 Mich App at 64–65.

" 'There is no unconstitutional delegation of power where the legislature acts upon a subject as far as is reasonably practicable but, from the necessities of the case, leaves to executive officials the duty of bringing about the result pointed out by the statute, where a policy is laid down and a sufficient standard is established by statute, or where a statute sufficiently indicates the legislative purpose and merely leaves the administrative details to some agency.' 1 Am Jur 2d, Administrative Law, § 111, pp 911–912.

" 'The purpose of the statute, the requirements it imposes, and the context of a particular provision may show that the broad standard it establishes does not require a construction as comprehensive as the words alone permit and is not so vague and indefinite as to amount to a complete absence of a standard.' 1 Am Jur 2d, Administrative Law, § 118, p 926." 43 Mich App at 67–68.

Based on *Vanderkloot* and the foregoing authority, we conclude that it is not necessary to state the rate or formula of computation any more distinctly than the Act and program do. We hold that the Marketing Act is not unconstitutional and does not improperly delegate legislative taxing authority. Provisions of this type have been held constitutionally valid. *Chapman v United States,* 139 F2d 327 (CA 8, 1943), *Edwards v United States,* 91 F2d 767 (CA 9, 1937), *United States v Rock Royal Co-operative, Inc,* 307 US 533; 59 S Ct 993; 83 L Ed 1446 (1939).

## II

### DELEGATION OF LEGISLATIVE POWER

Plaintiff-appellant next contends that the Act

unlawfully delegates legislative power to private individuals in violation of the provisions of the Constitution, 1963, art 3, § 2, which states:

"The powers of government are divided into three branches; legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."

and Const 1963, art 4, § 1, which states:

"The legislative power of the State of Michigan is vested in a senate and a house of representatives."

The procedures set forth in the Act delegate to the Department of Agriculture the task of determining whether the proposed program complies with the standards expressed in the Act.

In *Milk Marketing Board v Johnson,* 295 Mich 644, 651; 295 NW 346 (1940), the Court stated:

" 'It is too well settled to need the citation of supporting authorities that the legislature, within limits defined in the law, may confer authority on an administrative officer or board to make rules as to details, to find facts, and to exercise some discretion, in the administration of a statute * * * .' "

The Court in *Vanderkloot, supra,* also discussed delegation of legislative authority.

A delegation involving participation by industry members is not unconstitutional when an administrator has the power to approve the program as is provided in § 10(a) of the Marketing Act. See *Sunshine Anthracite Coal Co v Adkins,* 310 US 381; 60 S Ct 907; 84 L Ed 1263 (1940). We recently

upheld the Legislature's delegation of authority to a construction code commission which had adopted certain codes promulgated by private entities. We held this not to be an unconstitutional delegation of legislative power to private entities. *City of Warren v State Construction Code Commission,* 66 Mich App 493; 239 NW2d 640 (1976).

We hold that there is no improper unconstitutional delegation of legislative authority in the Marketing Act. We find that the ratification of the administrator's actions by the affected industry does not result in unlawful delegation of authority to that group where the administrator has the power of approval as does the director in the Marketing Act *sub judice.*

No costs, a public question being involved.