EDMUND STEVENSON, CHAIRMAN OF THE HUDSON COUNTY REPUBLICAN COMMITTEE, EDWARD F. ZAMPELLA, GEORGE R. POLKOWSKI, URBAN G. TIETGEN AND FRANCIS M. McINERNEY, PLAINTIFFS-APPELLANTS, v. WILLIAM H. GILFERT, COUNTY CLERK OF HUDSON COUNTY, DEFENDANT-RESPONDENT..

Argued October 13, 1953—Decided October 13, 1953.

*Mr. Frank G. Schlosser* argued the cause for the appellants (*Messrs. Morris Chesler* and *John J. Geronimo,* attorneys).

*Mr. Frederick J. Gassert* argued the cause for the defendant-respondent.

*Mr. Abraham Lightdale* argued the cause for the intervenors-respondents.

The opinion of the court was delivered by

JACOBS, J. At the primary election held in Hudson County on April 21, 1953 Republican candidates for State Senate, General Assembly and Board of Freeholders were duly nominated. *R. S.* 19:13–14. On September 23, 1953 the chairman and secretary of the Hudson County Republican Committee sent notices to members of the committee that a special meeting would be held in Jersey City on September 28, 1953. Under date of September 25, 1953 the Republican candidates signed resignations and at the meeting of September 28, 1953 candidates for the resulting vacancies were selected. *R. S.* 19:13–20. These new candidates were not members of the Republican party; they were members of the Democratic party and had voted as such in the primary held on April 21, 1953. Although they

tendered certificates consenting to stand as candidates of the Republican party in the November 1953 election, they could not and did not certify that they were members of the Republican party as required by *R. S.* 19:13–20. Because of this, the county clerk refused to accept their certificates and declined to place their names on the ballot as the Republican candidates.

Thereafter, the plaintiffs instituted their action in the Law Division of the Superior Court to compel the defendant county clerk to accept the certificates and place the names on the ballot as Republican candidates. A motion to intervene by several members of the Hudson County Republican Committee was granted and cross-motions for summary judgment were presented and heard. Judge McGeehan, sitting in the Law Division, upheld the constitutionality of the requirement in *R. S.* 19:13–20 that a candidate selected by the county committee to fill a vacancy resulting from the resignation of a person nominated at a primary election as a party candidate must be a member of the same political party. In addition, he expressed the view that the meeting at which the vacancies were filled was not a legal meeting "because the notice of the meeting was sent out two days before the vacancies occurred and the members of the county committee had no proper notice or legal notice that at such meeting the county committee would consider the selection of candidates to fill vacancies which had not occurred at the time the notice was sent out or received." On October 6, 1953 Judge McGeehan ordered that summary judgment be entered against the plaintiffs and in favor of the defendant and the intervenors. An appeal was duly taken to the Appellate Division, was certified to this court, and was heard on October 13, 1953. After argument of the appeal we affirmed the summary judgment entered below and announced that this opinion would be prepared and filed in due course. *Cf. Ray v. Blair*, 343 *U. S.* 214, 216, 72 *S. Ct.* 654, 96 *L. Ed.* 894, 897 (1952).

In the *Blair* case Justice Reed in viewing the matter from its national aspect, properly noted that political parties were

not born with the Republic but were created by necessity; that originally nominees for public office were designated by self-appointed individuals; that this system was early succeeded by party conventions; and that because of public dissatisfaction with the political manipulation of conventions they have been largely superseded by direct party primaries. Our own state history has followed the same course. Prior to 1789 we had no statewide parties although there were county and sectional alignments. Nominations for office could readily be made by individuals and groups of individuals. However, following the first Congressional elections statewide political parties came into full being, conventions were held for the selection of party candidates, and party slates began to appear. Throughout most of the 19th Century party candidates were selected at conventions which were conducted without any state regulation whatever. In 1878 our Legislature passed its first enactments which related to party primaries and conventions. *L.* 1878, *cc.* 113, 204; *Boots, The Direct Primary in New Jersey* (1917), 15. There were later enactments and in 1898 a comprehensive revision of the election laws was adopted; they embodied only relatively minor provisions bearing upon primaries and conventions. However, in 1903 the Legislature adopted a supplement (*L.* 1903, *c.* 248) which dealt extensively with the subject and launched our now long-standing state policy of having fully regulated closed primaries. Indeed, New Jersey has been described as "one of the most tightly closed of the closed primary states." *Merriam and Overacher, Primary Elections,* 71 (1928).

The 1903 act contained provisions for direct nominations for certain offices at primaries and for the selection at primaries of convention delegates authorized to nominate for other offices. The primary elections were to be conducted at public expense and official ballots, ballot boxes, registry lists and polling booths were to be used. Voters of any political party could file "a petition endorsing any member of their political party" as a candidate. A voter, if challenged, was required to take oath that he was a member of

the political party and had voted for a majority of its candidates at the last election. And any voter who voted as a member of one political party could not "vote in the ballot box of any other political party at the next thereafter succeeding primary election." The act contained numerous other regulatory provisions which need not be detailed here. They represented full legislative recognition that primary elections were no longer matters of private concern to be dealt with by party managers in any manner they chose but, on the contrary, were of public concern and required regulation in the public interest. See *Wene v. Meyner*, 13 *N. J.* 185, 192 (1953).

In *Hopper v. Stack*, 69 *N. J. L.* 562 (*Sup. Ct.* 1903), Justices Garrison, Garretson and Swayze were called upon to determine the constitutionality of the 1903 act. In sustaining it they expressed the view that primary elections "are so far matters of public concern that they are proper objects of legislative oversight" and that "the question of their reasonable regulation presents a problem in legislative discretion, the solution of which is solely a legislative function, which in the present instance has been legitimately exercised." The provisions designed to confine participation in the party primary to party members were specifically upheld and authorities elsewhere were generally in accord. *Merriam and Overacher, supra,* 124. In the earlier case of *Commonwealth v. Rogers*, 181 *Mass.* 184, 188, 63 *N. E.* 421, 423 (*Sup. Jud. Ct.* 1902), Justice Holmes had remarked that such restrictions were not unreasonable precautions "against the fraudulent intrusion of members of a different party for sinister purposes." And there is no foundation for the notion that they add to the qualification of voters as set forth in the Constitution. Voters have the right to vote as individuals at the general election so long as they meet the reasonable procedural requirements embodied in the election laws. They have no right to vote in the primary of any particular political party unless they are members of that political party as reasonably defined by the Legislature. In the language of Professor Mechem, the voter

"has no constitutional right as a non-partisan to participate in partisan proceedings." Mechem, *Constitutional Limitations on Primary Election Legislation,* 3 *Mich. L. Rev.* 364, 377 (1905). *A fortiori* a voter who is a member of one political party may be excluded from participating in the party primaries of other parties espousing adverse political principles. See *Wene v. Meyner, supra,* where this court, through Justice Heher, recently stated that it was within the proper legislative province to restrict primary participation to those who have practical affiliation with the particular party and "to repel interference from outsiders who are not bound by the common tie and do not share the common aim." In *State ex rel. Labauve v. Michel,* 121 *La.* 374, 46 *So.* 430, 435 (*Sup. Ct.* 1908), the court, citing *Hopper v. Slack, supra,* with approval, similarly expressed the underlying considerations:

"It is of the very essence of a primary that none should have the right to participate in it but those who are in sympathy with the ideas of the political party by which it is being held. Otherwise the party holding the primary would be at the mercy of its enemies, who could participate for the sole purpose of its destruction, by capturing its machinery or foisting upon it obnoxious candidates or doctrines. It stands to reason that none but Democrats should have the right to participate in a Democratic primary, and none but Republicans in a Republican primary. A primary is nothing but a means of expressing party preference, and it would cease to be that if by the admission of outsiders its result might be the very reverse of the party preference."

See *Healh v. Rotherham,* 79 *N. J. L.* 22, 26 (*Sup. Ct.* 1909), where the court (Swayze, Trenchard and Minturn, JJ.) stated that it was "for the Legislature to determine how the party affiliations and the resulting right to vote at a party primary were to be determined" and that so long as the legislative requirements were not arbitrary no constitutional objection could be raised.

It is true that the foregoing comments relate particularly to restrictions on voters rather than candidates, but the distinction is without real significance. See *Hager v. Robinson,* 154 *Ky.* 489, 157 *S. W.* 1138, 1146 (*Ct. App.* 1913):

"All that is said by the authorities, *supra*, as to tests of party loyalty and party membership applies with equal force to electors voting in and candidates voted for in primary elections; and, whether applied by legislative enactment to the one class or the other, they are equally reasonable. It is to be remarked that the object of the present Primary Election Law is to purify the politics of the state, by preventing frauds and wrongdoing in making nominations; and it will be to the interest of political parties and the welfare of all the citizens of the state to effectuate the salutary purposes designed by its enactment. Indeed no political organization can be effective that does not command public confidence and respect; therefore the integrity of all party nominations should be so manifest as to put them above being called into question."

In *Hopper v. Stack, supra,* our former Supreme Court dealt also with the issue of whether the Legislature could constitutionally require that candidates of a political party listed on the official primary ballot be members of that party. It construed the then pertinent sections of the act as not imposing such requirement but said (69 *N. J. L.,* at 570) :

"If, however, the legislative intention to be gathered from both sections is that the official ballots furnished at public expense for use at the primary elections by political parties shall contain the names of members of such parties, respectively, no constitutional right is invaded. Citizens who prefer to place in nomination a candidate who is not of the same political party as themselves are free to give expression to such preferences, but in a different manner."

It may be noted that the 1903 act contained express provision for write-in of any candidate at the primary. *L.* 1903, *c.* 248, *p.* 616. Our present laws similarly embody provisions for write-in at the primary (*R. S.* 19:23–16) as well as direct nomination by petition without primary. *R. S.* 19:13–3 *et seq.* Although there are conflicting authorities, the majority view throughout the country is that a legislature may, without violating constitutional inhibitions, state or federal, impose reasonable requirements designed to insure that a person listed as a party candidate on the official ballot is a member of that political party. See *Merriam and Overacher, supra,* 129; *Ray v. Blair, supra; Roberts v. Cleveland,* 48 *N. M.* 226, 149 *P.* 2d 120, 153 *A. L. R.* 635 (*Sup. Ct.* 1944) ; *State ex rel.*

*Murphy v. Graves,* 91 *Ohio St.* 36, 109 *N. E.* 590 (*Sup. Ct.* 1914); *State ex rel. Curyea v. Wells,* 92 *Neb.* 337, 138 *N. W.* 165, 41 *L. R. A., N. S.,* 1088 (*Sup. Ct.* 1912); *Gardner v. Ray,* 154 *Ky.* 509, 157 *S. W.* 1147 (*Ct. App.* 1913); *Smith v. Ward,* 47 *S. D.* 243, 197 *N. W.* 684 (*Sup. Ct.* 1924); *Darst v. County Election Board of Craig County,* 194 *Okla.* 469, 152 *P. 2d* 912 (*Sup. Ct.* 1944). *Cf. Swindall v. State Election Board,* 168 *Okla.* 97, 32 *P. 2d* 691 (*Sup. Ct.* 1934); 29 *C. J. S., Elections,* § 114, *p.* 153 (1941). In the *Roberts* case, *supra,* the court recently restated the supporting reasons, pointing out that every voter who satisfies the constitutional qualifications may stand for and be elected to office but may not stand as the candidate of any particular political party on the official ballot unless he meets the reasonable statutory requirements designed to establish that he is a member of that party. And the voter may vote for whom he pleases and his right to do so at the primary and general elections must remain unimpaired, but he "may not be deceived by false labels" and the Legislature may take appropriate steps to that end.

*In re City Clerk of Paterson,* 36 *N. J. L. J.* 298, 88 *A.* 694 (*Sup. Ct.* 1913), an oral opinion by Chief Justice Gummere, is cited as taking a different view. There the issue presented was whether the city clerk should be directed to place the name of a candidate on the official ballots of the Republican and Progressive parties. His answer was in the affirmative on the ground that the controlling legislation was not prohibitory (*cf. R. S.* 19:14–9); in the course of his opinion he doubted the legislative authority to restrict party members from nominating whom they please regardless of party. See *In re Callahan,* 200 *N. Y.* 59, 93 *N. E.* 262 (*Ct. App.* 1910). *Cf.,* however, *Ingersoll v. Curran,* 188 *Misc.* 1003, 70 *N. Y. S. 2d* 435 (*Sup. Ct.* 1947), affirmed 297 *N. Y.* 522, 74 *N. E. 2d* 465 (*Ct. App.* 1947). But do not the provisions for write-in and direct nomination preserve the rights of all electors to vote for whom they please even where the Legislature has expressly directed that party candidates appearing as such on the official primary ballot

must be party members? *Cf. Brower v. Gray, 5 N. J. Super.* 145, 148 *(App. Div.* 1949); *Freeman v. Board of Registry and Election,* 76 *N. J. L.* 83, 85 *(Sup. Ct.* 1908). In *Smith v. Ward, supra,* the court found that its state legislature, in its effort to effectuate "responsive and responsible party government," had imposed a requirement that the political party's candidates appearing on the official primary ballot must be members of the party and readily concluded that it was valid. And in *Francis v. Sturgill,* 163 *Ky.* 650, 174 *S. W.* 753 *(Ct. App.* 1915), the court suggested that any contrary view might defeat the very purposes of its state primary law and render it wholly ineffective.

 Our election law, though the result of patchwork and badly in need of legislative revision, does embody provisions designed to insure that a party candidate appearing as such on the official primary ballot must be a member of the political party. See *R. S.* 19:23–7. *Cf. R. S.* 19:23–5; *Brower v. Gray, supra,* 148. Whether the requirement should be abandoned in favor of other approaches prevailing in some other states (see *Penniman, Sait's American Parties and Elections* (4th ed. 1948), 412; *Hart v. Jordan,* 168 *Cal.* 321, 143 *P.* 537 *(Sup. Ct.* 1914)), need not detain us since that is a matter of legislative rather than judicial concern. It is sufficient to note, as this court indicated in *Kilmurray v. Gilfert,* 10 *N. J.* 435, 441 (1952) and *Wene v. Meyner, supra,* that the party system embodies our accepted traditions and, believing with proper cause that it is in the public interest, the Legislature may adopt reasonable regulations calculated to protect against its deterioration and abuse. See *Darst v. County Election Board of Craig County, supra.* It is, of course, recognized that the welfare of our state and nation requires that the best qualified persons be obtained to fill public offices; but party philosophies and principles are by no means without significance, and in seeking to select the best qualified persons the electorate is entitled to assume generally that the candidates who choose to appear on the official primary ballot as candidates of a particular party

are at least members of that party with such resulting social implications as may arise.

The present case does not actually involve an attack on the statutory requirement that the original party primary candidates be members of the political party. They were Republicans and presumably complied fully with the party affiliation terms of *R. S.* 19:23–7. At the primary the Republican voters granted to them full approval of their candidacy as the Republican candidates at the general election. However, for reasons not disclosed in the record they resigned and as a result the Republican voters were deprived of their candidates. It appears to us that to meet such emergency the Legislature had the clear right to provide for the filling of their vacancies in a manner reasonably calculated to carry out the wishes of the Republican voters who, as a practical matter, could not then speak for themselves. When the direct primary came into full bloom in our State, Governor Wilson hopefully expressed the view that it would restore political control to the people who might once and for all take charge of their own affairs. While subsequent events have left much to be desired, there is little question that the direct primary has at least afforded broad opportunities to party voters to select their own party candidates. Having selected them, as here, they are entitled to such protection as may be provided against political manipulations which deprive them of their chosen candidates and substitute candidates of a different party espousing adverse political principles.

In *Francis v. Sturgill, supra,* the court forcefully rejected an attempt by the Republican county committee to substitute a Democrat as the Republican candidate in the stead of the candidate who had been selected at the Republican primary. Though the pertinent state legislation was not clear, the court construed it to mean "that when a vacancy occurs in a party ticket after the election of its nominees at a primary by the voters of the party, such vacancy must be filled by the governing authority of such party by selecting therefor a nominee who

possesses the qualifications as to political belief and party affiliation that, under the provisions of the primary act, would have entitled him to get his name on the party primary ballot as a candidate seeking its nomination for the office in question." Reason and the keeping of faith with party primary voters require this limited protection, and our Legislature has not left the matter to conjecture or construction. Thus, in 1945 it amended *R. S.* 19:13–20 to provide that where, as here, a substitute candidate is chosen by the county committee, there must be a statement by the committee that he "is a member of the political party filling the vacancy" and a certificate by the candidate setting forth, among other matters, "that he is a member of the political party named in said statement." See *L.* 1945, *c.* 263. Later amendments of *R. S.* 19:13–20 retained these provisions. See *L.* 1948, *c.* 261; *L.* 1949, *c.* 24. It is conceded that in the instant matter the new candidates did not meet this particular requirement and we are not now concerned with such additional provisions as are embodied in the law. The requirement is wholly reasonable and we fail to find any constitutional provision, state or federal, which it may be said to violate. It does not limit the privilege of the voters to choose whom they please at the election (*R. S.* 19:15–28) and it does not restrict any candidate from standing for office as a write-in candidate or as an independent candidate where the statutory provisions relating to direct nominations have been fulfilled. *R. S.* 19:3–3. All it does is prohibit a candidate of opposing political faith from standing for election as the substitute candidate of a particular political party, named on the official ballot as such. This restriction does not in anywise constitute an additional qualification or eligibility requirement for office beyond those prescribed in the constitution within the principles set forth in *Imbrie v. Marsh*, 3 *N. J.* 578 (1950), and *Stothers v. Martini*, 6 *N. J.* 560 (1951). See *Francis v. Sturgill, supra*:

"There is a marked difference between one's being ineligible to hold an office and ineligible to run for it as the nominee of a particular party. Eligibility to hold the office must depend upon

whether the candidate claiming to have been elected to it possesses the constitutional qualifications if the office be one created by the Constitution, or the statutory qualifications if it be one created by statute, to hold it. But whether one is eligible to run for office as the nominee of a party by getting his name on the ballot at a regular election, under its device, depends upon whether he possesses the political qualifications and party affiliation prescribed by the primary election law, entitling him to become its nominee; and this is true whether his nomination is secured through the voters of the party in a primary election or its committee in filling a vacancy."

See also the cases collected in Note, *The Constitutionality of Anti-Fusion and Party-Raiding Statutes*, 47 *Col. L. Rev.* 1207, 1209 (1947).

In *Gansz v. Johnson*, 9 *N. J. Super.* 565, 568 (*Law Div.* 1950), Judge Donges expressed the view that the requirement in *R. S.* 19:13–20 that the substitute candidate selected by the county committee must be a member of the political party filling the vacancy constitutes an "arbitrary exclusion" from candidacy for office in violation of our State Constitution. We cannot accept this view. On the contrary, we believe that the restriction is just and proper and is well designed to carry out the wishes of the voters who expressed themselves at the party primary and who have no further opportunity to do so until the general election. The party system and the direct primary were not created by our Constitution and are not referred to therein; they are now admittedly subject to reasonable control by the Legislature for the general good and we are satisfied that the particular provision under attack in this proceeding falls well within the orbit of its authority.

Affirmed.

*For affirmance*—Justices Heher, Wachenfeld, Burling, Jacobs and Brennan—5.

*For reversal*—Chief Justice Vanderbilt, and Justice Oliphant—2.