MURIEL S. SMITH, PLAINTIFF-APPELLANT, v. ROSE PENTA, JUDGE OF BOARD OF ELECTIONS, DISTRICT ONE, BOROUGH OF HIGHLANDS, ALYNN TRACY HECK, SUPERINTENDENT OF ELECTIONS, COUNTY OF MONMOUTH, STATE OF NEW JERSEY, ANN FLYNN, MONMOUTH COUNTY BOARD OF ELECTIONS, STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Argued October 16, 1978—Decided July 19, 1979.

66

*Mr. William E. Wilson* argued the cause for appellant.

*Mr. Stephen Skillman* argued the cause for respondents (*Mr. John J. Degnan*, Attorney General of New Jersey, attorney; *Ms. Erminie L. Conley*, Deputy Attorney General, of counsel; *Mr. Nathan M. Edelstein*, Deputy Attorney General, on the brief).

The opinion of the court was delivered by

MOUNTAIN, J.

A primary election was held June 7, 1977. On that day the plaintiff, a resident of the Borough of Highlands in Monmouth County and a registered Republican, sought to register as a Democrat in order that she might vote forthwith in that party's primary election. Her request to register was denied and she immediately filed a complaint and sought the issuance of an order to show cause why she should not be granted declaratory and injunctive relief. The trial judge dismissed the complaint and that same day the Appellate Division affirmed this ruling. We granted plaintiff's petition for certification, 76 *N.J.* 235 (1978), and now affirm.

The section of our Election Law with which we are here concerned, fixes certain of the requirements for voting in a primary election and reads as follows:

No voter shall be allowed to vote at the primary election unless his name appears in the signature copy register.

A voter who votes in a primary election of a political party or who signs and files with the municipal clerk or the county commissioner of registration a declaration that he desires to vote in the primary election of a political party shall be deemed to be a member of that party until he signs and files a declaration that he desires to vote in the primary election of another political party at which time he shall be deemed to be a member of such other political party. The Secretary of State shall cause to be prepared political party affiliation declaration forms and shall provide such forms to the commissioners of registration of the several counties and to the clerks of the municipalities within such counties.

No voter, except a newly registered voter at the first primary at which he is eligible to vote, or a voter who has not previously voted in a primary election, may vote in a primary election of a political party unless he was deemed to be a member of that party on the fiftieth day next preceding such primary election.

A member of the county committee of a political party and a public official or public employee holding any office or public employment to which he has been elected or appointed as a member of a political party shall be deemed a member of such political party.

Any person voting in the primary ballot box of any political party in any primary election in contravention of the election law shall be guilty of a

misdemeanor, and any person who aids or assists any such person in such violation by means of public proclamation or order, or by means of any public or private direction or suggestions, or by means of any help or assistance or cooperation, shall likewise be guilty of a misdemeanor. [*N.J.S.A.* 19:23–45]

Implementation of the balloting regulations set forth in this statute results in a nominating procedure which is widely regarded as a "closed" primary. Where such an election scheme prevails—as it does, in some form, in the great majority of states [1]—only those who qualify as members of a particular political party may vote in that party's primary election. Except as noted, New Jersey has always adhered to the closed primary system.[2] As this Court has observed,

New Jersey has been described as "one of the most tightly closed of the closed primary states." *Merriam and Overacher, Primary Elections,* 71 (1928). [*Stevenson v. Gilfert,* 13 *N.J.* 496, 499 (1953)] [3]

---

[1] Developments in the Law-Elections, 88 *Harv.L.Rev.* 1111, 1163 (1975) (hereinafter *Developments*); Note, Primary Elections: The Real Party in Interest, 27 *Rutgers L.Rev.* 298 (1974) (hereinafter *Primary Elections*).

[2] *N.J.S.A.* 19:23–45, the enactment here under attack, formerly provided that a voter who wished to change his political affiliation must abstain from voting in two consecutive primary elections. In *Nagler v. Stiles,* 343 *F.Supp.* 415 (D.N.J.1972) (3-judge court), this requirement was held unconstitutional and *N.J.S.A.* 19:23–45 was stricken. Another statute directed to this subject did not take effect until December 12, 1975, *L.*1975, *c.* 260. Thus from May 26, 1972, the date of the *Nagler* decision, until December 12, 1975, the effective date of the last mentioned statute, New Jersey had an "open" or unregulated primary election system and in fact was classified as an "open" primary state. *Developments, supra* at 1163, n. 65, 1170, n. 90.

[3] This Court's opinion in *Stevenson v. Gilfert, supra,* contains a concise history of primary election legislation in New Jersey. To the authorities to which Justice Jacobs' opinion makes reference may now be added *McCormick, The History of Voting in New Jersey-A Study of the Development of Election Machinery* (1664–1911) 189 *et seq.* (1953).

A closed primary system generally includes, as is true in New Jersey, some kind of affiliation requirement designed to exclude certain types of voters.

> Affiliation statutes might be designed to prevent four types of individuals from voting in party primaries: (1) voters generally affiliated with another party but wishing to cross over to a rival party's primary to support a weak candidate who is likely to lose in the general election to the nominee of the voters' preferred party (raiders); (2) voters generally affiliating with another party but wishing to cross over to support their preferred primary candidate in case the nominee of the voters' own party loses the general election (second choice supporters); (3) voters generally affiliating with another party but wishing to cross over to support a candidate preferred over any potential nominee of the voters' own party (crossovers); (4) voters generally not affiliating with any party but wishing to support a particular party candidate (independents). [*Developments, supra,* 88 *Harv.L.Rev.* at 1164]

In order the more effectively to exclude such classes of persons, well over half the states "condition primary voting on party affiliation of a certain duration." *Developments* at 1169–70. As we have seen, in New Jersey the period is now 50 days. *N.J.S.A.* 19:23–45.

Plaintiff asserts that this statute is unconstitutional. The argument may be summarized as follows: The foregoing statutory provision requires, in all but the excepted cases, that a declaration of affiliation with a particular party be filed 50 days preceding the primary election. Another section of the Election Law, *N.J.S.A.* 19:23–14, stipulates that nominating petitions may be filed with designated public officials up to and including the fortieth day prior to the primary election. Thus, the argument concludes, a prospective voter is required to file a declaration of affiliation before he or she can know with certainty who all of the candidates for office may be. It is contended that this offends both Federal and State Constitutions in that it impairs a citizen's right to vote.

In *Rosario v. Rockefeller,* 410 *U.S.* 752, 93 *S.Ct.* 1245, 36 *L.Ed.* 2d 1 (1973), the Supreme Court sustained a New York statute

that conditioned an individual's right to vote in a particular party's primary on his having declared an affiliation with that party eight to eleven months before the date of the primary election. The Court found the state interest in preventing raiding sufficient to justify the exclusion. Raiding occurs when members of one party vote in the primary election of the other party with the intention of nominating a weak candidate who could probably be defeated by the candidate of their true party in the general election. Obviously, raiding will tend to weaken the political party attacked and if successful will result in a fraudulent candidacy.

[A] candidacy determined by the votes of nonparty members . . . . is, in practical effect, a fraudulent candidacy. [*Rosario v. Rockefeller*, 458 *F.2d* 649, 652 (2d Cir. 1972), aff'd 410 *U.S.* 752, 93 *S.Ct.* 1245, 36 *L.Ed.2d* 1 (1973)]

Among other points raised by the plaintiffs in *Rosario* was the issue before us here—that the statutory scheme required "party enrollment before prospective voters ha[d] knowledge of the candidates or issues to be involved in the next primary election." 410 *U.S.* at 760, 93 *S.Ct.* at 1251, 36 *L.Ed.2d* at 8. The Court apparently felt no need to address this point.

Following this unsuccessful challenge to New York's primary election system, certain aspects of Connecticut's primary system were challenged in *Nader v. Schaffer*, 417 *F.Supp.* 837 (D.Conn. 1976) (3-judge court). The attack was upon a statutory provision which required an individual to register as a member of a particular party before voting in that party's primary election. In the course of his opinion sustaining the legislation, Circuit Judge Anderson emphasized two important interests which a closed primary seeks to protect. It was noted that the associational rights of the party's membership are shielded from intrusion by those with adverse political principles and aims, and furthermore, that

a state has a more general, but equally legitimate, interest in protecting the overall integrity of the historic electoral process. This includes preserving

parties as viable and identifiable interest groups; insuring that the results of primary elections, in a broad sense, accurately reflect the voting of party members. Parties should be able to avoid primary election outcomes which will confuse or mislead the general electorate to the extent it relies on party labels as representative of certain ideologies; and preventing fraudulent and deceptive conduct which mars the nominating process. [417 *F.Supp.* 837, 845]

The court went on to say,

As we have noted, the phrase "preservation of the integrity of the electoral process" contemplates, in the nominating context, the assurance that primary election results reflect the will of party members, undistorted by the votes of those unconcerned with, if not actually hostile to, the principles, philosophies, and goals of the party. The phrase contemplates the prevention of fraud in the nominating process, and a candidacy determined by the votes of non-party members is arguably a fraudulent candidacy. See *Rosario v. Rockefeller*, 458 *F.* 2d 649, 652 (2 Cir. 1972), aff'd, 410 *U.S.* 752, 93 *S.Ct.* 1245, 36 *L.Ed.*2d 1 (1973). [*Id.* at 846–47]

The decision was affirmed by the Supreme Court. 429 *U.S.* 989, 97 *S.Ct.* 516, 50 *L.Ed.*2d 602 (1976).

*Rosario* and *Nader* make it abundantly clear that the New Jersey statute under attack suffers from no federal constitutional infirmity.

■ Before proceeding to plaintiff's state constitutional claim, let us first point out that had she fulfilled the durational affiliation requirement and registered 50 days or more before the election, she could have voted. But at that time, she points out, she *might* not have known who all of the candidates were to be, because someone *might* qualify as a nominee during the ensuing ten-day period. Since the plaintiff has failed to demonstrate that such an event actually occurred, we find this alleged imperfection in the primary election procedure to be *de minimis* and insufficient to overcome the self-inflicted character of her so-called "disenfranchisement." Only because the matter is of some public consequence, do we proceed to the substantive aspects of her contention.

■ In *Worden v. Mercer County Bd. of Elections*, 61 *N.J.* 325 (1972), we held that college students who were *bona fide* residents of their college communities could not be denied the right to vote in local elections. We viewed the Supreme Court's decisions in *Reynolds v. Sims*, 377 *U.S.* 533, 84 *S.Ct.* 1362, 12 *L.Ed.2d* 506 (1964) and *Dunn v. Blumstein*, 405 *U.S.* 330, 92 *S.Ct.* 995, 31 *L.Ed.2d* 274 (1972) as requiring that a denial of the right to vote be justified by a compelling state interest. Convinced of the soundness of the federal approach, we announced that, as a matter of state constitutional law, a showing of the same magnitude would be required in order to justify any restriction on the franchise as guaranteed by Art. II, § 3 of the New Jersey Constitution. That test, however, is inappropriate in this case. As will be amply demonstrated, it is inaccurate to say that a person such as the plaintiff, who is registered as a member of one political party and who desires to participate in the primary election of another party, has been denied the right to vote.

■ The State constitutional right to vote, secured by Article II, § 3 of the New Jersey Constitution, consists of the following:

> (a) Every citizen of the United States, of the age of 18 years, who shall have been a resident of this State and of the county in which he claims his vote 30 days, next before the election, shall be entitled to vote for all officers that now are or hereafter may be elective by the people, and upon all questions which may be submitted to a vote of the people;

Unlike the plaintiff and our dissenting colleagues, we fail to see how the entitlement "to vote for all officers that now are or hereafter may be elective by the people" could possibly be read as encompassing the right to participate in a particular party's candidate selection process. The right to vote, as guaranteed by the plain language of our State Constitution, does not subsume an unfettered right to be involved in a party's internal decision-making process, which is all that a primary election is. In this

state, the right to participate in a political party's primary election is a statutory one.

When a state statute is challenged on state constitutional grounds, the nature of state government and the distribution of sovereign power within it make the plaintiff's burden a heavy one. "[U]nlike the Federal Constitution, the State Constitution is not a grant but a limitation of powers." *Gangemi v. Berry*, 25 *N.J.* 1, 7 (1957). The federal government possesses only those powers ceded to it by the states in the Federal Constitution; the states possess all other powers of government. These reserved powers of government repose in the people but are exercised by the Legislature as the representative of the people. *N.J.Const., Art.* 4, § 1, ¶ 1. As such repository of these reserved powers the Legislature is free to act except (1) in respect of powers delegated to the federal government by the Constitution of the United States, and (2) as such exercise may be limited by the state constitution. There are no other restraints upon state legislative power.

> By *Article* IV, *section* 1, *paragraph* 1 of the 1947 *State Constitution*, the people vested full sovereign authority in the Legislature, save as otherwise therein provided. *Schmidt v. Board of Adjustment, Newark*, 9 *N.J.* 405 (1952). The theory of our political system is that the ultimate sovereignty is in the people, "from whom springs all legitimate authority"; and (1) the legislative authority in the States consists of "the full and complete power as it rests in, and may be exercised by, the sovereign power of any country, subject only to such restrictions as they may have seen fit to impose, and to the limitations which are contained in the Constitution of the United States," and the legislative department "is not made a special agency for the exercise of specifically defined legislative powers, but is intrusted with the general authority to make laws at discretion" . . . . [*Gangemi v. Berry, supra*, 25 *N.J.* at 8–9]

Because of the vast expanse of governmental power reposing in the legislature, one challenging a state statute, on other than federal constitutional grounds, indeed bears a heavy burden.

The established test for unconstitutionality under the state constitution is a rigorous one.

A constitutional prohibition against the exercise of a particular power is in the nature of an exception; and it is the settled rule of judicial policy in this jurisdiction that a legislative enactment will not be declared void unless its repugnancy to the Constitution is so manifest as to leave no room for reasonable doubt. The constitutional limitation upon the exercise of legislative power must be clear and imperative. This is a well defined limitation engrafted upon the function assumed by the courts, federal and state, to nullify a statute for unconstitutionality. *State Board of Milk Control v. Newark Milk Co.,* 118 *N.J.Eq.* 504; *Attorney-General v. McGuinness,* 78 *N.J.L.* 346, 369; *Sexton v. Newark District Telegraph Co.,* 84 *N.J.L.* 85; affirmed, 86 *N.J.L.* 701; *Bott v. Secretary of State,* 63 *N.J.L.* 289, 302, 45 *L.R.A.* 251. See, also, *Marbury v. Madison,* 1 *Cranch* 137, 2 *L.Ed.* 60. There is to be no forced or unnatural construction. Such constitutional limitation upon the general legislative power "is to be established and defined by words that are found written in that instrument, and not by reference to some spirit that is supposed to pervade it or to underlie it or to overshadow the purposes and provisions expressed in its written language." *State v. DeLorenzo,* 81 *N.J.L.* 613, Ann.Cas.1912D, 329. See, also, *Sturges v. Crowninshield,* 4 *Wheat.* 122, 4 *L.Ed.* 529. [*State v. Murzda,* 116 *N.J.L.* 219, 223 (E. & A.1935)]

In *Gangemi v. Berry, supra,* Justice Heher quoted at some length from an opinion of the Supreme Court of South Dakota. It is so apt and accurate that we repeat part of it here.

"[The people], in framing the constitution, committed to the legislature the whole lawmaking power of the state, which they did not expressly or impliedly withhold. Plenary power in the legislature for all purposes of civil government is the rule. A prohibition to exercise a particular power is an exception. In inquiring, therefore, whether a given statute is constitutional, it is for those who question its validity to show that it is forbidden." *People ex rel. Wood v. Draper,* 15 *N.Y.* 532, 543 (*App.Ct.*1857), Denio, Ch. J. The American legislatures "have the same unlimited power in regard to legislation which resides in the British parliament, except where they are restrained by written constitutions. That must be conceded, I think, to be a fundamental principle in the political organizations of the American states. We cannot well comprehend how, upon principle, it should be otherwise. The people must of course, possess all legislative power originally. They have committed this in the most general and unlimited manner to the several state legislatures, saving only such restrictions as are imposed by the constitution of the United States, or of the particular state in question." *Thorpe v. Rutland and Burlington Railroad Co.,* 27 *Vt.* 140

(Sup.Ct.1854), Redfield, Ch. J. [25 *N.J.* at 9–10 (quoting from *State ex rel. Richards v. Whisman*, 36 *S.D.* 260, 154 *N.W.* 707 (1915))] [4]

■ A full awareness of the vast scope of state legislative power must be kept constantly in mind in considering any challenge to an enactment where the contention does not rest on Federal constitutional grounds. Absent such grounds, the prohibition against the questioned act must be clearly set forth in the state constitution. We fail to find any such prohibition denying to the Legislature the right to pass this statute. The most that may be said of New Jersey's closed primary system is that it subjects an individual's right to vote in political party elections to certain restrictions. In light of the foregoing discussion, in order for the plaintiff to succeed, she must demonstrate that the state interests sought to be fostered by the Primary Election Law are insufficient to warrant these restrictions.

■ As was indicated in *Nader v. Schaffer, supra,* there are at least two significant interests that are protected by a closed primary election system with a durational affiliation requirement. First, such a system supports the associational rights of regular party members.

> "Association" is a constitutional term of art which describes the formation and perpetuation of collectivities for the purpose of advancing goals and beliefs and of expressing attitudes and philosophies. [*Primary Elections* at 302]

If a political party, which is such an association, must admit any and all who wish to vote in its primary election, there would

---

[4]That American state legislatures "have the same unlimited power in regard to legislation which resides in the British parliament except where they are restrained by written constitutions," should not be treated lightly. *See A. Dicey, The Law of the Constitution* 40–41 (6th ed. 1902) (" 'It is a fundamental principle with English lawyers, that Parliament can do everything but make a woman a man, and a man a woman.' ").

then most certainly ensue an erosion in the cohesive partisanship that is basic to the party's strength. A political primary election is something other than a purely public event insofar as it affords an opportunity to adherents of some political philosophy to advance their goals, proselytize their beliefs and seek to acquire or perpetuate their power. These interests—and others as well—are the associational values which state legislation may properly protect.

> If the courts successfully open the nominating process to all voters without regard to party affiliation the price may well be the decline of strong competitive parties. [Note, The Right to Vote and Restrictions on Crossover Primaries, 40 *U.Chi.L.Rev.* 636, 658 (1973)]

Secondly, as we have already mentioned, the state has a *strong public interest in maintaining the integrity of the electoral process.* This is significantly fostered by legislation designed to prevent "raiding." It has been recognized that "[r]aiders . . . will not want to foreclose their opportunity to vote in their own party's primary until the outcome is fairly certain. Crossovers and independents will not wish to commit themselves to one party until the candidates are clearly identified." *Developments, supra*, 88 *Harv.L.Rev.* at 1169. As Judge Kentz observed when the issue now before us was presented to the Law Division in *Friedland v. State*, 149 *N.J.Super.* 483 (Law Div. 1977):

> Plaintiffs urge this court to strike down or amend the declaration requirement so that affiliation be required only after the filing of primary candidate petitions, which occurs 40 days before the primary election. This argument ignores the principal purposes of the restriction, that is, to commit voters to party philosophies at a cut-off point that effectively minimizes opportunities for "raiding." The State has a legitimate interest in "preserving parties as viable and identifiable interest groups; insuring that the results of primary elections, in a broad sense, accurately reflect the voting of party members." *Nader, supra.* [149 *N.J.Super.* at 493]

We entirely concur with this statement.

Against the State's interest in the integrity of the electoral process and the associational rights of political parties must be

weighed the harm that is done to an individual who allegedly is denied the right to vote in a primary election. We are persuaded, as was the Supreme Court in *Rosario v. Rockefeller, supra,* that these interests are substantial enough to justify the modest restrictions which have been placed on what the plaintiff contends should be an individual's unfettered right to participate in a party primary.

Plaintiff's position is essentially a reflection of a point of view—said to be widely held—that voters are more interested in candidates than in parties. Whether or not this is so we do not know. Suffice it to say that the two-party system, including a closed primary with durational affiliation requirements such as we have in New Jersey, characterizes the governments of most states. If it is to be changed, the change must come from the legislature or from the people. It cannot come from the courts.

The judgment of the Appellate Division is affirmed.

PASHMAN, J., dissenting.

I respectfully dissent. Under present law, those who wish to vote in a political primary cannot obtain a complete list of candidates until 34 days before the election. *See N.J.S.A.* 19:23–14. Nonetheless, they are required to declare their party affiliation and thus limit the individuals for whom they can cast their ballot at least 50 days prior to the date of the primary. *N.J.S.A.* 19:23–45. Voters are thus deprived of the opportunity to make an informed decision as to party affiliation in light of the available candidates.

This system is apparently permissible under the federal constitution, *see Rosario v. Rockefeller,* 410 *U.S.* 752, 93 *S.Ct.* 1245, 36 *L.Ed.*2d 1 (1973). It is well established, however, that we are entirely free to interpret the provisions of our State Constitution so as to provide greater protection of individual rights than that offered by its federal counterpart. *See, e. g., State v.*

*Slockbower,* 79 *N.J.* 1 (1979); *So. Burlington Cty. NAACP v. Tp. of Mt. Laurel,* 67 *N.J.* 151 (1975); *Robinson v. Cahill,* 62 *N.J.* 473 (1973). In my view, the statutory scheme here at issue is violative of *N.J.Const.* (1947), Art. II, par. 3.[1]

## I

Preliminarily, I feel constrained to comment upon the majority's intimation that a plaintiff must bear a heavier burden in order to overturn a statute on state constitutional grounds than to invalidate it as repugnant to the federal constitution. This conclusion on the majority's part is premised upon the fact that "the federal government possesses only those powers ceded to it by the states in the Federal Constitution; the states possess all other powers of government." See *ante* at 74. From this undeniably true premise, however, the majority is led to conclude erroneously that state legislatures possess almost limitless ability to enact laws which do not transcend the federal constitution.

The fallacy in the majority's argument is easily perceived. The Tenth Amendment to the United States Constitution provides that those powers not delegated to the federal government are reserved to the *states.* It does not repose these powers in state *legislatures.* Rather, states remain free to distribute these powers as they see fit among the executive and legislative branches of government, or not to allow either entity to exercise them.[2]

---

[1]Art. II, par. 3 provides in pertinent part:

(a) Every citizen of the United States, of the age of 18 years, who shall have been a resident of this State and of the county in which he claims his vote 30 days, next before the election, shall be entitled to vote for all officers that now are or hereafter may be elective by the people, and upon all questions which may be submitted to a vote of the people  *  *  *.

[2]In fact, it should be noted that our own Constitution provides that "[a]ll political power is inherent in the people  *  *  *." *N.J.Const.* (1947), Art. I, par. 2.

In this state, the people—through the adoption of the 1947 Constitution—have determined that the ability of the legislature to enact various types of laws shall be limited. One such limitation—the one relied upon by plaintiff—is contained in Art. II, par. 3 (*supra* at 79, n. 1). If the statutory scheme here at issue has violated this constitutional provision, that statutory scheme must fall. And this is so, regardless of whether a violation of the federal constitution has occurred.

It therefore makes no sense to say that a plaintiff must bear a heavier burden in order to overturn a statute on state constitutional grounds than to invalidate it as repugnant to the federal constitution. Whether a law is challenged on state or federal constitutional grounds, the plaintiff bears the same burden. In order to prevail, all he need do is demonstrate that in enacting that law, the Legislature has exceeded the limits imposed by a particular constitutional provision.

The majority's conclusion to the contrary represents a serious departure from precedent. We have not hesitated in the past to strike down legislation that has contravened our state constitution, regardless of its validity under federal law. *See, e. g., State v. Baker*, 81 *N.J.* 99 (1979); *State v. Celmer*, 80 *N.J.* 405 (1979); *State v. Saunders*, 75 *N.J.* 200 (1977); *Robinson v. Cahill* (I through V), 62 *N.J.* 473, *cert.* den. *sub nom., Dickey v. Robinson*, 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.2d* 219 (1973); 63 *N.J.* 196, *cert.* den. *sub nom., Dickey v. Robinson*, 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.2d* 219 (1973); 69 *N.J.* 133 (1975); 70 *N.J.* 155 (1976); 70 *N.J.* 464 (1976); *Oakwood at Madison, Inc. v. Township of Madison*, 72 *N.J.* 481 (1977); *So. Burlington Cty. NAACP v. Tp. of Mt. Laurel*, 67 *N.J.* 151, app. dism. and *cert.* den., 423 *U.S.* 808, 96 *S.Ct.* 18, 46 *L.Ed.2d* 28 (1975); *Vreeland v. Byrne*, 72 *N.J.* 292 (1977). *Cf. State v. Tropea*, 78 *N.J.* 309 (1978); *Bor. of Neptune City v. Bor. of Avon-by-the-Sea*, 61 *N.J.*

296 (1972). *See generally*, Brennan, "State Constitutions and the Protection of Individual Rights," 90 *Harv.L.Rev.* 489 (1977).

## II

The franchise is one of our most fundamental and cherished rights. This Court has proclaimed the vote to be the "keystone of a truly democratic society." *Gangemi v. Rosengard*, 44 *N.J.* 166, 170 (1965). Other rights, "even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 *U.S.* 1, 17, 84 *S.Ct.* 526, 535, 11 *L.Ed.2d* 481, 492 (1964). Moreover, this right is equally applicable to both general elections and political primaries. *See, e. g., Quaremba v. Allan*, 67 *N.J.* 1, 11 (1975); *Bullock v. Carter*, 405 *U.S.* 134, 146–147, 92 *S.Ct.* 849, 857–858, 31 *L.Ed.2d* 92, 101–102 (1972); *Gray v. Sanders*, 372 *U.S.* 368, 83 *S.Ct.* 801, 9 *L.Ed.2d* 821 (1963); *Terry v. Adams*, 345 *U.S.* 461, 73 *S.Ct.* 809, 97 *L.Ed.* 1152 (1953); *Echevarria v. Carey*, 402 *F.Supp.* 183 (S.D.N.Y.1975), aff'd, 538 *F.2d* 309 (2d Cir.), vacated and remanded for mootness, 429 *U.S.* 808, 97 *S.Ct.* 44, 50 *L.Ed.2d* 68 (1976); *Friedland v. State*, 149 *N.J.Super.* 483, 490 (Law Div.1977). The majority's suggestion that primary matters are not protected by *N.J.Const.* (1947) Art. II, par. 3 is surprising in light of this Court's holdings in *Quaremba v. Allan, supra*, and *Stevenson v. Gilfert*, 13 *N.J.* 496, 503, 506 (1953).

The right to vote does not encompass merely the ability to cast a ballot. That right "would be empty indeed if it did not include the right of choice for whom to vote." *Gangemi v. Rosengard, supra*, 44 *N.J.* at 170; *see Quaremba v. Allan, supra*, 67 *N.J.* at 11; *Sadloch v. Allan*, 25 *N.J.* 118 (1957); *Reynolds v. Sims*, 377 *U.S.* 533, 555, 84 *S.Ct.* 1362, 1378, 12 *L.Ed.2d* 506, 523 (1964) ("The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."). Without the option to choose, the vote itself is devoid of practical significance. It is with respect to this freedom that the

current statutory scheme unnecessarily infringes upon the exercise of the franchise.

As previously noted, persons interested in voting in a political primary must, with certain exceptions not here relevant, declare their party affiliation before they are able to ascertain the complete list of those running for office. Once having declared their affiliation, they may not change it in light of a new candidacy announced after the 50-day deadline. Thus, a voter may be precluded from supporting the primary candidate of his choice.[3] And, unless that candidate wins the primary election, the voter will never have the opportunity to cast his ballot for the preferred officer seeker. The 50-day deadline therefore results in a serious incursion upon the voting rights of our citizenry.

Because of the critical importance of the vote to the functioning of our society, in order not to transcend constitutional bounds, substantial restrictions upon its exercise must be, necessary to promote a compelling governmental interest. *See, e. g., Dunn v. Blumstein*, 405 *U.S.* 330, 342, 92 *S.Ct.* 995, 1003, 31 *L.Ed.* 2d 274, 284 (1972); *Echevarria v. Carey, supra*, 402 *F.Supp.* at 187; *Wurtzel v. Falcey*, 69 *N.J.* 401, 403 (1976); *Worden v. Mercer County Bd. of Elections*, 61 *N.J.* 325, 346 (1972). That is, such restrictions must both serve a paramount governmental goal and impinge upon the franchise to a lesser extent than any other feasible means of attaining that goal.

The majority identifies two State interests which it concludes justify the present restriction upon voter freedom. First, it asserts that the "integrity of the electoral process" is preserved

---

[3]The majority points out that in this case no candidate actually filed after the 50-day affiliation deadline. Although this is correct, it is irrelevant to the legal analysis involved. The gravamen of plaintiff's complaint is that she could not intelligently choose a party without being certain of the complete list of candidates. Her quandary was in no way affected by occurrences—or non-occurrences—which took place after the deadline had passed.

in that "raiding" is deterred. Second, it emphasizes that the present scheme enables political parties to maintain their distinct and separate identities and ideologies. To this list might be added a concern for administrative efficiency. Although I agree that all three of these goals are legitimate, nevertheless I am convinced that each could be adequately effectuated by less restrictive measures. Consequently, the present statutory scheme violates the imperative of voter freedom and must be stricken.

The most frequently offered justification for durational affiliation requirements is the deterrence of "raiding"—that is, the practice of registering for the primary election of a rival party for the purpose of nominating a weak candidate likely to lose in the general election. At the outset, it should be noted that the majority's concern with the frequency of "raiding" appears to be more a product of judicial imagination than reality. *See* "Developments in the Law-Elections," 88 *Harv.L.Rev.* 1111, 1173 (1975) (noting that evidence suggests that the likelihood of "raiding" is overstated). A large number of our sister states have "open" or "blanket" primaries in which citizens may vote in either or both of the primaries. *Id.* at 1163 n.65. Several other states require declarations of affiliation but allow them to be made up to and including the date of the election. *Id.* at 1164, 1164 n.66. Surely their experience belies any contention that lengthy deadlines are necessary to prevent "raiding." Thus, a shorter deadline—one which would allow voters to know the candidates before opting for a party—would adequately further the State's speculative interest in deterring any "raiding" that might otherwise occur.

The State's concern with preserving party identity can similarly be assured through less severe restrictions. Political parties are not, and probably never were, tightly knit, static organizations of ideologically identical individuals. Rather, as Justice Powell has noted, they "have been characterized by a fluidity and overlap of philosophy and membership." *Rosario v. Rocke-*

*feller, supra,* 410 *U.S.* at 769, 93 *S.Ct.* at 1256, 36 *L.Ed.*2d at 14 (Powell, J., dissenting). Citizens "customarily choose a party and vote in its primary simply because it presents candidates and issues more responsive to their immediate concerns and aspirations." *Id.*[4]

Even assuming, however, that the affiliation requirements are of some aid in the preservation of party identity, it is difficult to accept the proposition that a 30-day deadline, for example, would less fully protect that interest than the present 50-day limitation. A 30-day filing requirement, moreover, would not preclude a voter from making an informed choice as to party affiliation in light of available candidates. It thus represents a more reasonable method of achieving the State's legitimate goal.

The majority does not attempt to support the present registration scheme on grounds of administrative efficiency. Yet, it is clear that the mechanics of processing party registrations would justify the imposition of a reasonable deadline for submitting a declaration of affiliation. However, a 30-day limitation would appear more than adequate to satisfy this need.

For the foregoing reasons, I conclude that the State interests here involved are insufficient to outweigh the significant incursion upon the right of our citizens to vote for candidates of their own unfettered choosing. Voters should not be precluded from altering their party affiliation in response to a promising candidate or an important issue. The current system, by compelling voters to make an uninformed choice as to party membership, severely curtails that freedom. It thereby impermissibly burdens the right to exercise the franchise and hence violates *N.J.Const.* (1947), Art. II, par. 3.

---

[4]The majority states that plaintiff's case is bottomed on the belief "that voters are more interested in candidates than in parties." See *ante* at 78. This clearly overstates the case. Instead, plaintiff's claim is based upon the undeniably true conclusion that some people will be desirous of changing their affiliation in light of a particular candidate who raises new issues or takes a new stance on old issues.

Although the 50-day durational affiliation requirement, as it presently stands, contravenes the State Constitution, nevertheless it could be argued that it is not necessary to invalidate the statutory registration scheme *in toto*. Rather, it might be possible—as an interim measure pending legislative action—for us to reduce the deadline to 30 days before the election. In this way the interests of both the State and the voters would be reasonably effectuated and our citizens would be able to exercise their franchise in a more informed and effective manner. Inasmuch as the majority has concluded that the statutory scheme is wholly constitutional, it is not necessary to consider the merits of such a proposal.

Accordingly, I would reverse the judgment of the Appellate Division and hold that *N.J.S.A.* 19:23-45 is unconstitutional.

Justice SULLIVAN joins in this dissenting opinion.

*For affirmance*—Chief Justice HUGHES and Justices MOUNTAIN, CLIFFORD, SCHREIBER and HANDLER—5.

*For reversal*—Justices SULLIVAN and PASHMAN—2.